## Asher v. Broughton.

## Bingham v. Same.

## Same v. Broughton et al.

(Decided October 22, 1929.)

MARTIN T. KELLY, I. G. LEABOW, N. J. WELLER and CHARLES E. HERD for appellants.

N. R. PATTERSON for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

Henry Broughton, James F. Asher, and J. S. Bingham were candidates for the Republican nomination for sheriff in Bell county at the primary election in August, 1929. The result as certified by the county board of election commissioners indicated that Broughton received 3,217 votes, Asher 2,401, and Bingham 1,705. Asher contested the nomination of Broughton, and Bingham contested the nomination of both Broughton and Asher. Broughton made counter charges against both Asher and Bingham. The cases were consolidated, and the chancellor did not find sufficient evidence to authorize him to cancel the certificate of nomination which had been awarded to Broughton. Consequently, he dismissed the claims of both Asher and Bingham, leaving Broughton the nominee as certified by the county board of election commissioners.

There were several grounds alleged in the pleadings as the basis for the attack on the result of the election as certified, but the proceedings were reduced to one point as the trial progressed, and it has reached us as a contest involving the Corrupt Practice Act of 1916 (sections 1565b1 to 1565b21 Ky. Stats.).

The evidence may be divided into two groups for convenient consideration; that is (1) the evidence relating to the illegal and improper expenditure of money for the purpose of influencing voters, and (2) the amount of money expended. If the proof shows that money, or other thing of value, was used by Broughton, or by his friends with his knowledge, to improperly and illegally influence voters, he violated the laws against such practices whether the amount spent was great or small. Although the proof may not show that money, or other thing, was so used, yet if more was expended than $1,500 in prosecuting his campaign for election, he violated the laws notwithstanding the expenditures may have been made for purposes not prohibited by the laws.

The record has been considered by the court, and while there is no necessity for going into the facts in great detail, we deem it proper to briefly group the facts developed.

That there were fraudulent practices and improper methods used in the election is shown by the record. Large sums of money were expended, and votes were bought and sold in some of the precincts. The evidence does not disclose such an orgy of corruption as has been shown in some other cases, but enough bribery and corruption was proven to disqualify any one who with his knowledge was its beneficiary. The matter before the court is whether the evidence in the case connects Broughton with illegal practices and violations of the laws governing such elections.

Laws against corruption in elections should be strictly enforced, and courts should seek no excuse for not sternly condemning the infractions of such laws. No man should enjoy or profit by that which he has obtained through the violation of laws enacted to protect elections from evil influence exerted by the bribe giver and the bribe taker. The man who bribes a voter, or suffers it to be done with his knowledge and in his interest, is not a fit person to hold public office. The law has so declared, and the sooner such persons and the public realize that such laws are to be fearlessly and sternly enforced, the sooner will bribery and corruption be numbered among the things that once were.

On the other hand, the will of the people must not be lightly set aside. There must be substantial proof, something of consequence, substance, and weight, which shows a violation of law, before courts are authorized to declare

that the apparent result of an election does not express the will of the people, or that the successful candidate has destroyed his victory through his willful violations of some law. Mere surmises, conjectures, and speculations based upon suspicious circumstances are not sufficient. There must be facts and circumstances as a basis for such a judgment, or the facts and circumstances must be such as to enable a court to reasonably infer that the laws have been violated. These principles are deducible from the opinions in the cases of Baker v. Colson, 210 Ky. 277, 275 S. W. 879; Hardin v. Horn et al., 184 Ky. 548, 212 S. W. 573; Hall v. Martin, 183 Ky. 120, 208 S. W. 417; Damron v. Johnson, 192 Ky. 523, 233 S. W. 910; Manning v. Lewis, 200 Ky. 732, 255 S. W. 513; Mellon v. Goble, 210 Ky. 711, 276 S. W. 830; and a number of other cases dealing with the same subject-matter. The opinions of this court more recently handed down disclose a tendency on the part of the court to adhere strictly to the principles announced in the earlier opinions. This court has not hesitated to declare that there was no election when the facts justified it in dealing with contests over the result in final elections, or to declare that a candidate should be deprived of his nomination if the facts and circumstances showed that he had violated the laws against corrupt practices, or allowed it to be done by others with his knowledge.

Bearing in mind these rules, the court will apply them to the evidence. Broughton had many friends and supporters working in his behalf for some weeks preceding the primary election. Some of these workers came from other counties. Many of them were relatives by blood or marriage, and others were friends. They were engaged in advertising for him and soliciting votes. They visited many precincts in the county, traveling at times in an automobile, at other times by horseback, or on foot. They put up placards and handed out his small cards announcing his candidacy and soliciting the consideration of the voters. He paid some of these workers for their services, and some of them received their expenses, while others received nothing at all. The sums so expended by Broughton were not large. A candidate does not violate the law by employing persons to render such services, or by accepting such services, or by paying the expenses of those engaged in such work so long as the matter is kept within reasonable bounds. A candidate would make a poor race unless he had friends, and it is

proper and right for these friends to be active in his behalf in a reasonable and legal way. The evidence in these cases does not show that the work done in behalf of Broughton by his friends, kindred, and supporters preceding the primary was such as to fall under the condemnation of the law.

He was aided in this work, preceding the primary, by members of his family, his son, daughters, sons-in-law, nephews, and others. Usually a candidate looks to his kindred for assistance, and the desire of his kindred for his success is often sufficient to induce them to render valiant services. They may not violate the law in behalf of a candidate, but they are not to be condemned for zeal in his behalf. It would be an unfilial son who was not interested in the success of his father in a political race, and a father would be lacking in love for a worthy son if he should withhold such legitimate influences as he might have if the son should be a candidate. The evidence does not show, on this branch of the case, that the kindred of Broughton transgressed the laws in aiding him.

He and his son, not jointly but separately, according to the evidence, selected persons to act as precinct workers on the day of the primary, and to act as challengers. A custom has grown up as the result of which candidates employ workers at precincts on election day where such workers cannot be procured without employment because of their interest in the success of the candidate. Some of these workers are employed to bring voters to the polls, others keep a list of the supporters of the candidate and check off the names as the voters appear and cast their ballots, while others hand out cards to the voters who come to the polls, while yet others see the voters and solicit them to vote for the particular candidate. While it is to be regretted that it is necessary to employ and pay persons to do the work mentioned, and it is a reflection upon voters in many instances that they wait to be brought to the polls, yet it cannot be said that the practice is illegal so long as the work is confined to the limits enumerated. The proof in this case shows that Broughton had one or more workers in nearly all of the precincts in Bell county on the day of the primary. The number was not unreasonably large. What he did in this respect is not shown to have been illegal. When such practices indicate that money is paid to workers under the guise of employing them to aid the candidate on election day, when, in truth and in fact, the money is paid for the pur-

pose of securing the votes of the workers, they fall under the condemnation of the law. But we do not have such a state of facts here as would indicate that money used by Broughton in the employment of workers was used other than for legitimate purposes.

There is another group of workers yet to be dealt with, and they are they who are employed by candidates, or the friends of candidates, to go to the polls with money to be used in corrupting the election. If a candidate participates in the employment of such workers, he violates the law, and if those whom he employs, and with whom he places money for such purposes, engage in bribery and corruption, the candidate must be held responsible for what they do. It is this class of workers that must be severely condemed. It is the contention of counsel for Asher and Bingham that Broughton had such workers, and that they were engaged in their nefarious work in his behalf on the day of the primary and prior thereto with the knowledge of Broughton. In every primary some overzealous friend may transgress the law in behalf of his favorite candidate, but the candidate may not be held responsible for his zeal, or his improper conduct, unless he knows about it. Whether he knows about it depends upon the facts and circumstances. This court will apply sensible rules to the determination of whether the candidate should be held responsible for the acts of his friends. If there is substantial evidence that he knew of what they were doing, or if the circumstances are such that it may be inferred that he had knowledge of their acts, he must be held responsible; but if there is no evidence that he had knowledge of their acts, or if the facts and circumstances preponderate against his having such knowledge, the court will not charge the illegal practices of his friends to the candidate.

With these rules in view, we will proceed to a consideration of the evidence which tends to show that Broughton had such workers engaged in such wrongful practices on the day of the primary, or whether such workers engaged in such practices with his knowledge. Counsel for Asher and Bingham direct their chief attack on this branch of the case against the activities of Millard Creech. Millard Creech formerly resided in Bell county, but at the time of this primary he was a resident of Clark county. He had been a candidate at one time in an election where Asher was likewise a candidate, and he attributed his defeat to the improper efforts of Asher. He returned to Bell county before the primary with the de-

clared intention of paying a political debt that he owed Asher. Revenge on Asher was the motive that impelled him to take part in the primary. When he arrived in Bell county, he took account of the situation to determine who of the candidates against Asher was the one whom he could support with best assurance of bringing about his revenge. He decided that Broughton should be that candidate, and consequently he supported him. There is considerable evidence that he was very active, and there is evidence that he had money in bills of small denominations; that he privately consulted with voters under circumstances which raised a suspicion that he was improperly inducing them to vote for Broughton; that he held conferences with Floyd Broughton, the son of appellee; that he stated that he had money enough to win the election in a certain precinct for Broughton; that he told a witness that he did not mind what it took, he was going to carry the precinct for Broughton; that he told some one that he was going up to a precinct and leave a bunch of money. There is no evidence in the record remotely tending to show that Broughton, or his son, furnished any money to Creech; there is no evidence to show that Broughton was in any way responsible for the activities of Creech. Creech was at the home of Broughton, but there is no evidence to show what passed between them, and both Broughton and Creech, as well as the son of Broughton, testified that there was no money furnished, no directions given, and that what Creech did was done of his own volition. Creech further testified that he had about $75 which he brought with him from Clark county. He testified that he did not spend one cent of money to bribe, or improperly influence, voters; that he employed some workers at the precincts to distribute cards and he bought soft drinks and ice cream for some of the voters. He hired taxis to haul voters to the polls. He was rather promiscuous in the distribution of his money, but there is no evidence which connects Broughton with the expenditure of this money, or to show that he had knowledge of it.

There is one other worker, James Slusher, who was active in behalf of Broughton on the day of the primary and prior thereto. He spent considerable money, and the evidence discloses that it was wrongfully expended, and if it had been shown that Broughton furnished him the money, or was responsible for his conduct, there would be some real evidence against Broughton; but again

there is a failure to connect the activities of Slusher with Broughton. Slusher did not claim that he received any money, or instructions, from Broughton, and we cannot find any evidence in the record which contradicts the statement of Slusher.

Without going further into details on this branch of the case, it is sufficient to say that the evidence shows that some of those who supported Broughton probably violated the law, although they deny the charge most positively. But there is a total lack of direct evidence showing that Broughton knew of it, or that he directed it, or that he in any way consented to it.

It is true, as argued by counsel for appellant, that the law is not to be hoodwinked by colorable pretenses. It looks at the truth through all disguises. The amount of money illegally spent by those favorable to Broughton appears to have been small, although the smallness of the amount spent, if illegally expended, cannot be condoned, as was held in the case of Graham v. Alliston, 180 Ky. 687, 203 S. W. 563. Neither is direct evidence necessary to establish a violation of the law, as was held in the case of Butler v. Roberson, 158 Ky. 101, 164 S. W. 340. A bribery may be shown by circumstantial as well as direct evidence. Circumstantial evidence is sufficient to connect the candidate with the worker who illegally expends money, as was held in the case of Charles v. Flanary, 192 Ky. 511, 233 S. W. 904, and Hardin v. Horn, supra. But it requires more than a bare suspicion to connect the candidate with such illegal acts of his friends and supporters. If the circumstances are such from which the fact of the candidate's knowledge may be logically and unerringly deduced, the circumstances are sufficient to constitute affirmative evidence of the violation of the law by the candidate. But there are neither facts nor circumstances sufficient to enable a court to hold that there was affirmative evidence of the violation of the law on the part of Broughton so far as the illegal practices of workers on the day of the primary are concerned.

We have not overlooked the one bit of direct evidence which was proven against Broughton. Sam Saylor, a boy 21 years of age, testified that a few days before the election Broughton called him into a room and asked him how old he was. When he informed Broughton that he was 21, Broughton said to him, "Here is one dollar; think of me on the day of election." This incident stands unexplained. No other witness referred to it. If Brough-

ton denied that this took place, we have not found his denial. We do not find where he referred to it. We are unwilling to say that this isolated incident which shows that Broughton gave one dollar to a boy and requested that he be remembered on election day is sufficient, standing alone, to justify the court in visiting upon Broughton the severe penalty of depriving him of the nomination. If there had been other evidence, or circumstances amounting to evidence, showing that Broughton had followed the giving of money to voters for the purpose of influencing their votes, we might treat this as strong evidence that he had violated the law. Counsel for Asher and Bingham have no more than mentioned the incident in the able brief filed in their behalf. Broughton did not ask the boy even to vote for him, although that may have been the reasonable inference deducible from what he said. The incident could have been explained upon the theory that he desired to pay the boy for working for him in a legitimate way. But, be that as it may, the one incident is too trivial to weigh heavily with the court.

Probably the most serious question in the case is the amount of money expended. Asher and Bingham apparently were not in possession of any facts of gravity at the time of the institution of their contest. An examination of the record discloses that they depended largely on the evidence that they might obtain by an examination of Broughton himself and members of his family. Broughton testified that his expenses in the election did not exceed $1,000. This statement was attacked by Asher and Bingham, and, in an effort to show that he had expended large sums of money, they cross-examined Broughton about his financial affairs, both private and public, Broughton is county court clerk of Bell county. He kept an account in the Bell National Bank in the name of Henry Broughton, clerk. He kept an account in the First State Bank under the same name. He also kept an account in the Bell National Bank in the name of the Hosmer Coal Company. The Hosmer Coal Company was the name of a business owned by Broughton and his wife. Between June 1, 1929, and August 3, 1929, checks were drawn against the account of the Hosmer Coal Company aggregating $1,129.85 and against one of the others in the name of Broughton, clerk, in the sum of $5,117.08, and against the other in the sum of $4,953.81, aggregating $11,200.74. The two accounts kept in the name of the clerk carried the money received by the clerk

for the different state departments. Broughton testified that the Hosmer Coal Company account was the one on which he drew for all of his campaign expenses. He was called upon to produce the checks which were drawn against these three accounts between the dates mentioned, and he produced 29 checks against the Hosmer Coal Company account amounting to $428.34, 24 checks against one of the accounts carried in the name of the clerk amounting to $2,934.24, and 36 checks against the other account in the name of the clerk amounting to $2,740.40. The aggregate of these checks was $6,102.98. It is argued by counsel for Asher and Bingham that as he did not show what the other checks were for, it may be assumed that they were spent for matters in connection with the primary election. So far as the accounts in the name of the clerk are concerned, we hardly think there would 'be any presumption that this money was expended for primary expenses as it was an official account, and it is fairly well shown that there was no unusual variation in these accounts during the primary election period. It is contended by counsel for Asher and Bingham that of the checks produced on the Hosmer Coal Company account $329.85 was certainly expended for election matters, and a list of these checks are set out in the brief. This left a balance of $701.51 in that account which was unaccounted for. Counsel also insist that there is $1,508.85 shown to have been expended for election purposes in one of the accounts carried in the name of the clerk and $595 in the other; but we are convinced that the tabulation made carries items included as having been spent in the election without anything more than a surmise to support the theory that they were items of expense in the election. In one of the accounts $1,000 was drawn out which is charged up as an election expense, and other cash items aggregating about $500, and there is no proof to indicate that the money drawn was used in the election.

It is insisted that the burden was on Broughton to show what became of the money drawn out of these accounts immediately preceding the primary election, but this evidence was produced by Asher and Bingham in an effort to establish the amount of money which had been expended by Broughton in the election. He testified that he produced all of the checks which he could find. He did not know what some of the other checks were drawn for. Some of them, he said, were to pay the state the money

that was due by him as county clerk. We do not think that the rule that the failure of a party to produce evidence which is within his knowledge, and which he would naturally produce if it were favorable to him, gives rise to an inference that if such evidence was produced it would be unfavorable to him, applies in this case; but assuming that it does, the rule only applies to a party when he has the power to produce the evidence, and Broughton testified that he produced all the checks that he could find.

There are certain checks which were not produced and which are questioned by counsel for Asher and Bingham. One was drawn to cash for $300, one to the daughter-in-law of Broughton for $300, one for $1,450, one for $200, and one for $1,000. Broughton testified that he did not know about the $1,450 check. It was drawn on one of the accounts kept in the name of the clerk. That is all the evidence there is in connection with this particular item. The deputies in the clerk's office testified that they kept the checks until a settlement with the state had been completed and then they gave no further attention to them. The check for $300 to Laura Broughton, the daughter-in-law, was dated July 20th. The evidence shows that this was paid to Laura Broughton for services rendered in the clerk's office. If the evidence is true, she was paid at no regular time, but received a payment from the clerk from time to time, and this was one of such payments. The explanation offered by Broughton, as well as by his daughter-in-law, daughter, and son-in-law, and son, in regard to some of these transactions, was to the effect that Broughton had agreed to give $3,-000 towards the construction of a $12,000 to $15,000 home in Pineville which was at the time being built by his daughter. He turned over to her, so it appears, about $1,500 awhile before the election, and while it is not clear just what became of this money, the evidence tends to show that it was used in connection with the building of the home and the conduct of the business of one of the sons-in-law. At least, no one testified that any of it was used in connection with the election, but on the other hand they testified that it was not. It is shown that Broughton borrowed $3,000 awhile before the election which he says was to enable him to help his daughter-in-law in the building of her home, and he gave her a part of the money at this time. He loaned $1,800 to Ball for

which he took a note which appears to be good. He borrowed $1,000 in connection with one Arnett which he says was for the improvement of his mine. It is fairly clear that Broughton borrowed the $1,800 which he loaned to Ball. Ball seems to have been a candidate and was borrowing money propably for his campaign expenses, but there is no evidence which connects Broughton with the expenditure of the $1,800. It is shown that Broughton had considerable money immediately preceding the election, but it is also shown that this was not unusual. Unless there was some evidence to show that this money was used in the election, we cannot say that it was so used. The evidence discloses that there was not much Broughton money on the day of the primary. That seems to be admitted in brief of counsel for Asher and Bingham. If this money had been improperly used, or had been used at all in the primary, there certainly would have been more evidence of its use than we find in this record.

Counsel for Asher and Bingham set up a table in their brief which they say shows that Broughton expended $1,732 in his race. It is their contention that the evidence positively shows this. We cannot agree with counsel that all of the items should be charged as a part of his election expenses. We shall not attempt to go through the table and point out item by item the purposes of the expenditure, but we will call in question enough of the items to show that it cannot be certainly held that Broughton expended more than $1,500 according to the evidence, which is the amount he was authorized to expend under the law. There is one item of $50 contributed to H. M. Frakes. Frakes came to Bell county and established a school. It appears that he is a Methodist preacher, and that he supports his school through donations received by those interested in his work. The $50 given to him in behalf of his school should not be charged as campaign expenses. There is an item of $5 contributed to the Wallsend Ball Club. The evidence shows that a large number of people made subscriptions towards the establishment of this ball club. There is $5 donated to H. H. Asher, chairman of the Republican Committee of Bell County. Headquarters are maintained by donations. This appears from the evidence to be a part of the expenses of maintaining permanent headquarters. Under the authority of Taylor v. Neutzel, 220 Ky. 510, 295 S. W. 873, this should not

have been charged as campaign expenses. There is $15 to Mason Fultz which Broughton testified was a loan without any contradiction; there was $3 to Mary Slusher, his sister-in-law; there is $2 to Ed Philpot not in connection with the election; one to I. T. York for $25 which was a loan; one to Joe Lewis for $25 which was a loan; one to Joe Keith for $10 which was a loan; one for $100 to Franklin Mason which appears to have been the $100 which Broughton obtained in Middlesboro on the day of the election and of which sum he gave $25 to Minton; one to Luther Lefevers for $25 which was a loan; one to "Jeems" Slusher for $25 for a horse. There are other items in the account which make up the $1,732 subject to question. The testimony of Broughton about many of these is not disputed. Taking the evidence as a whole, the court is unable to say that it shows that Broughton expended more than $1,500. The contributions to churches, to the building of church houses, schools, charity, charitable organizations, friends, public entertainments, sports, and other similar things are always an incident to a political campaign. The candidate is sought out as an easy mark by every one who seeks a willing donor for many things that are highly commendable and others of doubtful propriety. Such expenditures are not campaign expenses unless it is made to appear that the candidate donated for the purpose of corrupting the election. If it should be shown that such donations were made under the guise of a lawful purpose, when in fact it was intended that the money should be improperly used the matter would be different. Public officials are constantly subject to importunities to make donations to many worthy causes, not only while they are seeking office, but after they are elected, and such donations often constitute a serious drain upon their meager income. About these matters the court may speak not only with the voice of one having authority, but with the voice of one having experience.

On the whole record this court has reached the conclusion that the judgment of the chancellor should not be disturbed.

Judgment affirmed.