## Lewis et al. v. Sizemore et al.
## Sizemore et al. v. Huff.

(Decided June 7, 1938.)

M. C. BEGLEY and L. D. LEWIS for Lewis, Huff and others.

J. H. ASHER and C. W. HOSKINS for Sizemore and others.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

At the November, 1937, election, there were three groups of candidates, each composed of three men, for membership on the Leslie County Board of Education. One group who received only three or four hundred votes are not involved here. Lewis, Asher and Huff, who favored the retention of J. D. Begley as County School Superintendent, received pluralities over Sizemore, Begley and Wooton, who favored Clarence Maggard for that office. These three defeated candidates filed contests against the successful group alleging a violation of the Corrupt Practice Act by and for them, Section 1565b-1, et seq., and claimed their own election.

The trial court, a special judge presiding, held Lewis and Asher not entitled to the offices, but found in favor of Huff. It was adjudged that none of the contestants were entitled to be declared elected and that

there were two vacancies on the board thereby created. Lewis and Asher appeal the judgment. The contestants have filed an appeal against Huff. His motion to dismiss that appeal is sustained for it was not filed within 30 days of the rendition of the judgment as is required by Section 1596a-12 of the Statutes. Whitt v. Reed, 235 Ky. 758, 32 S. W. (2d) 324. We, therefore, have for review only the evidence pertaining to the responsibility of the appellants for the claimed violations of the Corrupt Practice Act. As is usual in these contest cases, a large record has been made. We confine our consideration to the specific evidence pointed out in briefs as sustaining the respective contentions of the parties.

The trial court did not regard as being in violation of the statute the promise of employment of the superintendent and bus drivers and the repair of buildings. See Roberts v. Sturgill, 257 Ky. 194, 77 S. W. (2d) 789. Nor did he so regard the purchase of ginger cakes at the polls or their donations to the many unfortunates whose houses had been burned, or to the "maimed, the halt and the blind." That is right. Ginger cakes are good if made right—and there is no evidence that these were not made right—and it is not a corrupt practice to buy them. It is not claimed that the voters who ate them were either corrupted or painfully affected. The making of these tips or donations is one of the pleasures of running for office—or penalties, as one may look at it. In Asher v. Broughton, 231 Ky. 165, 21 S. W. (2d) 260, we said (page 266):

"The candidate is sought out as an easy mark by every one who seeks a willing donor for many things that are highly commendable and others of doubtful propriety. Such expenditures are not campaign expenses unless it is made to appear that the candidate donated for the purpose of corrupting the election. If it should be shown that such donations were made under the guise of a lawful purpose, when in fact it was intended that the money should be improperly used the matter would be different. Public officials are constantly subject to importunities to make donations to many worthy causes, not only while they are seeking office, but after they are elected, and such donations often constitute a serious drain upon their meager income. About these matters the court may speak

not only with the voice of one having authority, but with the voice of one having experience.''

There is evidence that Lewis, the candidates' kinsman, and others, spent money wrongfully in their behalf, but there is no evidence worthy of the name tending to establish guilty knowledge of this on their part, and the candidates deny both authority and knowledge of those who spent the money. While knowledge of such misconduct may often be inferred from the circumstances, a candidate will not be held responsible for the zeal of his supporters leading to improper conduct unless it can be shown that he authorized or ratified their action. Liability is not to be imputed from the mere act itself. Asher v. Broughton, supra; Howard v. Parsons, 242 Ky. 704, 47 S. W. (2d) 545; Lovely v. Cockrell, 237 Ky. 547, 35 S. W. (2d) 891; Prewitt v. Caudill, 250 Ky. 698, 63 S. W. (2d) 954; Gallagher v. Campbell, 267 Ky. 370, 102 S. W. (2d) 340.

On the day before the election, Frances Kilburn was traveling up the creek with her baby. She had walked quite a distance and then ridden on a mule behind another woman. Being overtaken by the contestant, Lewis, and his running mate, Huff, she was given a ride in their truck. Coming to the county seat without being subpœnæd and without knowing that she was wanted as a witness, as she said, she related that Lewis gave her $3 ''to vote his way and go home and get my husband to vote that way.'' He was ''just freehearted and I thought since he was giving it away I could mighty easy take it.'' But her husband wouldn't take his share. Because of this gift she had voted for Lewis. Though quite difficult to handle on cross examination because of the expressed idea that what she had said and done here and there was none of the examiner's business, she told that the money had been given to her as she started up the road walking from a certain store where she had disembarked from the truck. She said that Huff was walking into the store and did not see the money pass. The general reputation of the witness is bad. Lewis denied giving the woman any money, and testified that going along the way he asked her to vote for him and she replied that under the circumstances she supposed she would have to. Huff supports Lewis in this and as to the circumstances and conditions at the store when the woman

says Lewis gave her the money. He testified that it would have been impossible for Lewis to have given her the money, as she states, without his having seen it and that he did not do.

Lee Jones, the father of the above witness, Frances Kilburn, testified that on the day before the election, in town, Lewis gave him $5 to work for him at the Hendrix precinct. He distributed cards and did what he could, but it was because of this money that he had voted for Lewis. He told nobody about his employment or being bribed until lately when he and his son-in-law got to talking about the election. Another witness related having seen Rebecca Caudill "secreting votes" at that precinct and giving Lee Jones and his son-in-law each $1.00. Jones' reputation is bad.

It is significant, we think, that Jones and his daughter had moved on the land of the father of Maggard, whom Lewis' opponents had favored for county superintendent. Lewis emphatically denies all of Jones' testimony and is positive that he had left town about 8 o'clock on the morning of the day before the election, and consequently he did not see Jones at all that afternoon there or anywhere else.

The only remaining evidence concerning Lewis' violation of the law is that of French Adams. He is the husband of Clarence Maggard's grandmother and his neighbor. He testified that he had been previously told that Lewis was opposed to his step-grandson for county superintendent, but Lewis told him that he favored Maggard, and gave him $6 with which to get votes. The witness bought Mrs. Bige Lewis and her two sons for $1 each. They did not testify. He is shown to be an unsavory character and to have a bad reputation for morality and veracity. Lewis denies having told Adams that he was for his grandson and denies giving him any money. It was well-known that he was opposing Maggard, and it is argued that it is unlikely that Lewis would have been so indiscreet as to have purchased the vote of his grandfather and designated him as a representative to buy other votes. We yield to the argument.

We come now to Asher's Case.

Ardill Coldwell is a large land-owner and in control of extensive property of a lumber company. He had

been defeated for the nomination of magistrate by Asher's brother-in-law and was actively opposing Asher and his running mate. Bill Roark and his wife were his tenants. He testified that on the morning of the election he saw Asher take them down the road where they stood close together. Roark testified that Asher took him and his wife down the road out of sight of everyone and gave each of them $2 to vote for his ticket. Asher had a big roll of money, but the witness did not ask for more. He did not see Asher "pluck" anybody else off that day. Coldwell hired the mule upon which he and his wife rode to the county seat and was paying their expenses while there to give their depositions. Mrs. Roark testified as did her husband. Henry Brock, who was present, never saw Asher take the Roarks or anyone else down the road or spend any money there.

Ben Saylor, another of Coldwell's tenants, who claimed the distinction of being 44 years old and the father of 12 children, testified that Asher took him down the road and gave him $2 to vote for him. The witness had previously sold his vote when living in Bell County.

Alisee Coldwell related that Asher with money in hand took her up the road and gave her $1 to vote for him. She had previously promised Ardill Coldwell, her landlord, to vote for the other crowd but this $1 changed her mind. She told Coldwell about this transaction later when she went to see him to get his O. K. on an order on the lumber company's commissary. Her nephew, Shelby Bailey, gave her $1 to vote in the sheriff's race, as she testified. Bailey saw Asher take Alisee up the road and take some money out of his pocket and hand to her.

The reputation of each of these four witnesses was established as bad. Asher denies having seen Saylor or the Roarks at all. Though he talked to Alisee Coldwell, he gave her no money. She seemed to be for him.

We are not unmindful that specific evidence of vote-buying must usually be that of vote-sellers who, by their very admission, prove themselves to be a low grade of witnesses. Many of them seem to think that accepting money for their time in going to the polls or even for their votes is not wrong, but swearing falsely is, and the latter they profess they will not do. But we

are not unmindful either that, though often difficult to obtain, where there has been vote-buying by the candidate, corroborative evidence consisting of direct testimony or of circumstances is available. Sometimes the very number of witnesses and the conditions surrounding them at the time and when giving their testimony indicate the existence of a purpose thus to corrupt an election. But in this case every one of the witnesses against the contestees in the above instances, excepting Mr. Coldwell, is a vote-seller and shown to have a bad reputation otherwise. Bailey, who testified to slight corroborative circumstances, is a confessed vote-buyer and is otherwise impeached. The conditions under which the witnesses appeared to testify, and the nature of their testimony, further weakens its probative value. In some of the instances related it would seem that if the witnesses were speaking the truth corroborative circumstances could well have been proven. It is to be remembered that the burden was upon the contestants. Over against the evidence which they produced are the emphatic denials of the candidates and in some instances there is corroborative evidence. Thus there is the evidence of Lewis and Huff, on one side, against Frances Kilburn alone. Men and women of this character are usually subject to the dominion of stronger persons and stronger persons appear on this scene.

It is a serious matter to brand a man guilty of corrupting an election, to deprive him of the fruits of his political victory, to set aside the apparent will of the people, and to burden a county with the expense of conducting another election. Therefore, we have often held that an election should not be lightly set aside and that it will not be unless facts are established by competent and substantial evidence, fairly warranting the conclusion of guilt. Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026; Howard v. Parsons, supra; Salyer v. Gross, 253 Ky. 296, 69 S. W. (2d) 376; Gallagher v. Campbell, supra. Though we have given due regard for the opinion of the trial judge, we are convinced that the election of the contestees should not be set aside.

Wherefore, the judgment is reversed.