KOMMERS ET AL., RESPONDENTS, v. PALAGI, APPELLANT.

(No. 8,051.)

(Submitted September 24, 1940. Decided December 13, 1940.)

[108 Pac. (2d) 208.]

*Mr. W. P. Costello* and *Messrs. Speer & Hoffman,* for Appellant, submitted a brief; *Mr. Costello* and *Mr. Harvey B. Hoffman* argued the cause orally.

*Mr. George E. Hurd,* for Respondents, submitted a brief, and argued the cause orally.

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* appearing as *Amici Curiae,* on Behalf of the Montana Sheriffs and Peace Officers Association, submitted a brief; *Mr. Rankin* argued the cause orally.

Opinion: PER CURIAM.

This appeal is from the judgment of the district court for Cascade county adjudging contestee guilty of violating the Cor-

rupt Practices Act, and declaring his election to the office of sheriff of Cascade county void, and declaring the office of sheriff vacant, and awarding the contestants their costs and attorney's fees.

Contestee was a candidate for election to the office in question in the 1938 election. In the primary election he secured the Republican nomination, and the official canvass after the November election showed that he had a majority of the votes cast for that office. This action was brought by the contestants— duly qualified electors and residents of Cascade county.

Briefly stated, the petition alleges in substance that the contestee violated the Corrupt Practices Act in various ways, including treating of voters, the distribution of things of value, and by exceeding the limitation placed upon the expenditures of the candidate as provided by law. The general and special demurrers were overruled. Contestee answered denying the most of the allegations and affirmatively answering that certain of the items distributed were not articles of value within the statute, but merely advertising materials. As a separate defense contestee set up his election and qualification as sheriff in 1938, and that as sheriff he had a right to hold over until his successor had been elected and qualified. The facts will be discussed more fully later in this opinion.

In entering upon a study of this case the attitude of this court is expressed in the following statement from the case of *State ex rel. La Follette* v. *Kohler*, 200 Wis. 518, 228 N. W. 895, 905, 69 A. L. R. 348, 349: ''At this point it is not improper for us to say that we realize the importance which attaches to the decision in this case, whatever it may be. A correct solution of the questions presented is of far greater importance than the personal or political fortunes of any candidate, incumbent, group, faction or party. We are dealing here with laws which operate in the political field—a field from which courts are inclined to hold aloof—a field with respect to which the power of the legislature is primary and is limited only by the Constitution itself. It has been said so many times it scarcely needs to be said again, that the realization of the democratic ideal

of self-government rests upon an intelligent, informed, honest and vigilant electorate. It is because of this that a large percentage of the public revenues is devoted to the education of our youth in order that they may not only be informed, but have their consciences awakened to their duties as citizens. All efforts to educate and awaken the electorate amount to nothing if corrupt appeals made to its prejudices or its cupidity, lead it to cast a ballot otherwise than in accordance with its convictions, uninfluenced by anything save considerations of public policy. A democratic state must therefore have the power to protect itself against the consequences of ignorance, indifference and venality and prevent all those practices which tend to subvert the electorate and substitute for a government of the people, by the people and for the people, a government guided in the interest of those who seek to pervert it. That self-government by the people is threatened to-day wherever it exists throughout the world is recognized by every thoughtful person. The threat arises from the inaction and indifference of those qualified to exercise primary political power, the electorate, and from the influence of sinister and subversive forces set in motion by those who would prompt governmental action favorable to their private interests without regard to its effect upon the public interest.''

Not only, as was said in the quotation above, is the Corrupt Practices Act intended to guarantee the purity of elections and to assure a free exercise of the franchise by the voter uninfluenced by any appeals to its prejudice or cupidity, but it is also designed to protect candidates for public office; and by limiting expenditures and forbidding certain practices, afford an equality of opportunity to the candidates and protect them from the pressure applied by salesmen and others whose purpose it is to increase their sales, or to secure personal benefit at the expense of the candidate. Without any limitation of expenditures and the prohibition against the distribution of articles of value and of treating, the campaign resolves itself into a battle, the result of which is determined by the ability of the various candidates to meet the pecuniary demands of various conflicting groups for personal gain.

The specifications of error are many. Most of them are directed to the question of the sufficiency of the evidence to sustain the court's findings. Others concern the admission of certain exhibits, and the court's findings as to expenditures allowed a candidate by law. Constitutional questions are also raised concerning the right of the people to enact the type of legislation here in question, and particularly the question of the contestee's right to hold over in the event the election of 1938 is declared void, as was done here.

Contention is made that the petition is insufficient. We do not deem it necessary to discuss this long petition at length. We have examined it in the light of the statutes and of the decisions of this court, particularly that in the case of *Tipton* v. *Sands,* 103 Mont. 1, 60 Pac. (2d) 662, 106 A. L. R. 474, and we find that it is sufficient within the statute. It specifically charges the contestee with various violations of the Corrupt Practices Act and the court properly overruled the demurrers and denied the motion for judgment on the pleadings.

The constitutional questions presented on this appeal are the same as those presented heretofore in an original proceeding before this court. (*State ex rel. Kommers* v. *District Court,* 109 Mont. 287, 96 Pac. (2d) 271.) Nothing was presented in the oral argument or the briefs of contestee and *amici curiae,* in the instant cause, to persuade us that the prior decision in this matter did not consider the questions fully or that it is not correct and controlling here.

In considering the specifications which deal with the sufficiency of the evidence, we enter into such consideration bearing in mind the often-repeated rule to the effect that in such examination the appellate court indulges in the presumption that the findings of the trial court are prima facie correct and restricts its inquiry to a determination of whether there is substantial evidence to support its findings. The rule is too familiar to require the citation of authorities.

The court found in finding No. 18 that Cascade county, during the time in question, was a county of the third class; that the salary and compensation of the sheriff within the provisions of the Corrupt Practices Act was $3,500 per year, and that "no

sums of money could be paid and no expenses authorized or incurred by contestee or on his behalf, by any political agent in campaigning for the position of sheriff of said county in excess of $350.''

The first question which presents itself under these findings concerns the correctness of the lower court's interpretation of the provision of the Corrupt Practices Act which provides in section 10774, Revised Codes: ''No sums of money shall be paid and no expenses authorized or incurred by or on behalf of any candidate who has received the nomination to any public office or position in this state * * * in excess of ten per cent. of one year's salary or compensation of the office for which he is nominated.''

It is the contention of contestee that the term ''salary'' or ''compensation'' includes not only the actual salary paid to the sheriff, but that it also includes the value of the living quarters furnished to him, the amount he received for the board of prisoners, both state and federal, and for mileage collected by his office. There is testimony that if these other items are included in fixing the amount which may be expended within section 10774, supra, the total expenditures of the alleged club and of contestee personally would not exceed that allowed by law.

Contestee relies on the case of *Spokely* v. *Haaven*, 183 Minn. 467, 237 N. W. 11. The Minnesota statute provides that a sum not exceeding one-third of the salary of the office may be expended. That court found that the word ''salary'' included all of the compensation accruing to the office; however, the only additional compensation considered there consisted of the fees which were collected, and there is no discussion of the specific problem which presents itself to us. What the fees were that accrued to the office of the sheriff in Minnesota does not appear in the record.

We believe that there can be no doubt as to the intention of the people when they enacted section 10774, supra. To hold that salary or compensation includes items contended for by contestee would require this court to read into the statute more than is present there now.

The theory on which mileage and board of prisoners is allowed to the sheriff is that such payment will only be sufficient to reimburse him for actual expenditures. There is no thought that any profit will accrue to him by reason of such payment.

Section 4867, Revised Codes, provides: "The county officers are entitled to receive as annual *compensation* or *salary* for services according to the following classification, to-wit: * * * [Counties of the third class] Sheriff, three thousand five hundred dollars." The same words, "compensation" or "salary," are used in section 10774. It is inconceivable that the legislature could have meant it to include in the latter section something not provided for in section 4867. That section specifically defines the terms. That section, as section 3116, Revised Codes of 1907, was in effect at the time the Corrupt Practices Act became the law. The only reasonable interpretation to be given the words in the Corrupt Practices Act is that they were used in the sense in that Act they were in the first. The court properly found the limit of the contestee's expenditures was the sum of $350.

It is urged that in spite of the provisions of section 4867, Revised Codes, the value of the residence furnished the sheriff, which he testified was $600 per year, was a part of the salary or compensation of the office. In addition to what we have said before which disposes of this contention, it may be said that no provision is made in law for the furnishing of such residence, and in view of the language of section 4867, it cannot be said that the people intended to include its value in the use of the words "salary" or "compensation."

The second inquiry we must make is as to the sufficiency of the evidence in support of the court's finding that the deputy sheriffs and Bob Gordon were acting as the political agents of the contestee, and that the expenditures included in the so-called "club" were actually "by and on behalf of" the contestee within the prohibition of the statute. This inquiry necessarily requires a rather lengthy consideration of the evidence.

In the leading case of *State ex rel. La Follette* v. *Kohler*, supra, the definition of the Wisconsin statutory provision which requires an accounting of funds spent in a political campaign for the benefit of the candidate and ''by and on his behalf'' is succinctly stated: ''In the Act, particularly that part relating to the amount which may be spent and the filing of accounts, the phrase 'by and on his behalf' is used. There is no difficulty in understanding what is meant by the term 'by'; the phrase 'on his behalf' when it refers to a candidate means by some one who acts for him in the sense that an agent acts for and on behalf of his principal. The authority may be express or implied but it must exist; otherwise the disbursement is not made on behalf of the person sought to be charged.''

In the findings of fact the lower court said this: ''The phrase 'on behalf of' as used in section 10774, supra, limiting the sums of .money which may be paid and the expenses which may be authorized or incurred by or on behalf of any candidate does not, in my opinion, mean the activities of a 'political committee.' It means the activities of a 'political agent,' who is a person 'who, upon request or under agreement [with the candidate], receives or disburses money on behalf of a candidate.' (Sec. 10775, Rev. Codes.)''

The court specifically found that the activities of the deputy sheriffs and of Bob Gordon brought their activities within the provisions of the statutes, sections 10774 and 10775, Revised Codes, and that they were political agents of the candidate within the definition found in *State ex rel. La Follette* v. *Kohler*, supra, and that the expenditures were on ''behalf of'' Palagi within the provisions of the statute and the definition stated in the *Kohler Case*. The court said in so finding: ''It is true that there is no direct testimony in the record of a definite agreement between the contestee and his political agents. Rarely can such an agreement be proved by direct evidence. But weighing all of the facts and circumstances introduced in evidence at the trial, considering the acts and conduct of the contestee and his deputies, as well as the documentary evidence,

one is led inevitably to the conclusion that such an agreement or understanding did in fact exist.

"'It is a serious matter to brand a man guilty of corrupting an election, to deprive him of the fruits of his political victory, and to set aside the apparent will of the people.' (*Lewis* v. *Sizemore*, 274 Ky. 58, 118 S. W. (2d) 133, 136). But the evidence in this case fairly and impartially considered, can lead to but one rational conclusion—that the Corrupt Practices Act of Montana has been violated in the particulars set out in the Findings of Fact herein."

The court goes on to find specifically, that immediately after the nomination of Palagi he formulated a scheme to secure his election by illegal means, that is, by excessive expenditures and treating, and the distribution of merchandise; and that he enlisted the services of his deputies and Bob Gordon to act and co-operate with him in this scheme, and that the beer, cigarettes, smoking tobacco, chewing tobacco, snuff and articles of value were distributed by these deputies with the connivance, consent and sanction of the contestee, "for the purpose of and with the intent to influence the qualified electors of Cascade county to vote for contestee for sheriff of said county."

The contestee personally, it is found, expended the sum of $334.88 in the campaign which appears by his own statement of expenditures filed in accordance with the law. The purported club, it is found, spent a sum in excess of $1,318.90, and that such sum was not actually paid for by any club, "but were paid for by contestee and his deputies sheriff and Bob Gordon as political agents, and that no club in fact existed and that this expenditure was by and on behalf of the candidate, and that the amount expended exceeded that allowed by law."

The court specifically found that no Palagi for Sheriff Club in fact existed. Contestants introduced in evidence an account filed with the county clerk which on its face purported to be the account of the club listing its expenditures and stating that a certain amount had been received by it without any indication from whom the contributions were received. This account bore the signature of Bob Gordon, duly verified. The record shows

that one of the deputies, Johnson by name, had actually paid for the items appearing in the club account, and that the money with which he paid the various bills was received by him in cash from Gordon. Johnson's desk was in contestee's office. All bills were received by him through the mail, and practically all of the bills were in the name of Palagi personally and were addressed to him. Johnson testified that he did not know, with the exception of Gordon and the possible exception of Costello, who, it is testified, was president of the club, any of the other officers or members of the club. He had not attended any meeting of the club and did not know that any meetings had been held. He had talked to no one who had attended any such meeting, or who knew of the officers or members of the club. If anyone was in a position to know something of the club, it was Johnson, since the disbursements appearing on the account filed by the so-called club were made by Johnson from cash received by him from Gordon from time to time.

Contestee said he knew none of the officers or members of the club, with the exception of the two mentioned, and had no knowledge of its existence except in a general way. He had never heard of any meeting of the club and disclaimed any responsibility for its actions. He did admit on the stand that he personally distributed material which appears on the club account. His connection with these items will be discussed more fully later.

Various deputies appeared on the stand and testified. The record shows that they spent a great deal of time in distributing the beer, cigarettes, chewing tobacco, snuff and merchandise which appeared on the club account. None of them had attended a meeting of any club or knew anything of its affairs. They knew no members of the club and knew none of its officers with the exception of Gordon; yet it appears that practically all of the work done in behalf of the contestee, and in which the so-called club was interested, was done by the deputy sheriffs and the contestee personally.

Error is predicated on the admission by the court of various ██ exhibits consisting of the ledger sheets from the various

firms providing the purported club with the many items heretofore mentioned appearing on the club account. They invoke the so-called "shop book rule." Particularly complained of is the ledger sheet of the Great Falls Breweries, Inc. It was made up of certain items shown in invoices marked Exhibit 8 and 8A to 8V. These exhibits show on their face that many barrels of beer were charged to Guy Palagi, starting the 20th of July, 1938, and ending the 24th of October, 1938. On some of the invoices certain directions were given as to delivery—such as "Del. Eagles Lodge—Last Del." and "Del. to Carpenters Hall" and "Old Last Chance." Some of the invoices were signed across the face by B. Erickson, a deputy. Some showed the beer to have been received by John Clark, Hugh Sheehan, Don Dwyer, another deputy, Don Preston and Tony Trimble.

The first objection is that the ledger sheet was inadmissible because of improper foundation. This argument is not tenable. Al Neils, under whose supervision the books of the Great Falls Breweries were kept, testified as to their correctness and as being made in the usual course of business. This is sufficient under the Montana requirements for the introduction of such evidence. (See *State* v. *Smart*, 81 Mont. 145, 262 Pac. 158.) See, also, 20 American Jurisprudence, page 917, where it is said: "A ledger may be admissible as a book of original entry where the items are taken from temporary memoranda or slips." Not only was this done in the present case, but the slips themselves are in evidence and verify the ledger sheets. (*Lewis* v. *England*, 14 Wyo. 128, 82 Pac. 869, 2 L. R. A. (n. s.) 401, and annotations in Ann. Cas. 1917C, 965, and 138 Am. St. Rep. 458.)

A more serious objection to this evidence is that the evidence as against Palagi in this case is hearsay. The general rule is that evidence of account cannot be used to determine a collateral issue as between third persons. (20 Am. Jur., p. 934; Jones, Commentaries on Evidence, 2d ed., vol. 4, p. 3285, sec. 1782; 1 Nichols on Evidence, p. 798; *State Bank of Pike* v. *Brown*, 165 N. Y. 216, 59 N. E. 1, 53 L. R. A. 513.) However, when there is other evidence to show that the party to the account knew of the account and the existence thereof, the books showing

the account become admissible. (*Roge* v. *Valentine,* 255 App. Div. 475, 7 N. Y. Supp. (2d) 958; *State* v. *Smart,* supra. See, also, *Baskett, Nichols & Norment* v. *Rudy,* 186 Ky. 208, 217 S. W. 112.) In the latter case the court held that when a good and sufficient foundation was laid proving the authenticity of the making then the evidence was competent.

In this case it is shown that Palagi paid for some of the items included in the account, that the beer was delivered to certain places at which Palagi was present, and that most of the beer was ordered and received by the deputy sheriffs. These, together with many interrelating circumstances, show that the beer was used in connection with the alleged plan to have Palagi elected as sheriff. It is inescapable that Palagi was cognizant of the account. As similar facts appear in relation to the accounts of the Volk Brewery and the firm of Devine & Asselstine, we see no reason for further discussion on this point.

In addition to these ledger sheets showing that the merchandise discussed was charged to Palagi and not to any club account in the first instance, the testimony shows that two items appearing in the club account—one a bill from the L. W. Wendt Company amounting to $50.16, and another from the Monogram Pencil Company amounting to $88.50, bear the signature of the contestee. There is some testimony to the effect that this signature was required as a guaranty on the part of the contestee that the club would pay the amount in question. There is other testimony that these items were owed by contestee personally. In any event, the testimony concerning these two items and the exhibits demonstrate that contestee was working with the group which made up the purported club, and that its expenditures to that extent, at least, had his sanction and consent. The testimony further shows that many of the various items appearing in the club account were delivered to the sheriff's office and that the contestee personally distributed some of these items, including articles of merchandise of value within the Corrupt Practices Act, such as pencils, handy menders and yard sticks.

The various exhibits together with the evidence sufficiently support the court's findings that no club existed and that the

expenditures of the purported club were actually those of Palagi, the deputy sheriffs and Gordon, the political agents of contestee within the provisions of section 10775, Revised Codes. The testimony affirmatively shows that no account of receipts or contributions to the purported club was kept, and no one appeared to explain where those contributions came from; that the disbursements which we have mentioned before were not made by the person holding himself out to be the treasurer of the club, but that instead they were made in cash by the deputy Johnson, whose desk was in contestee's office, from contributions in cash which he says he received from Gordon. Finally, the exhibits demonstrate that the merchandise, in most instances, was charged to contestee personally, and that none of it was delivered to any club but that instead it was delivered in the greater part to the contestee personally or to the deputy sheriffs.

From the record it would appear that Bob Gordon, who would know most about the existence of the club, was available to contestee and he could have been called as a witness. He was not called and, in considering the testimony, the trial court applied the rule found, in section 10672, subdivision 7, Revised Codes: "If weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust." The best evidence of the existence of the club would have been that which apparently Gordon could have given. His testimony, if it were favorable to contestee, might have established the independence of the club and rebutted the testimony indicating that the deputy sheriffs and Gordon were merely political agents of contestee within the provisions of the statute.

The mere facts that there was no club and that expenditures were made by others individually to aid in the election of contestee would not necessarily violate the Corrupt Practices Act or make such expenditures "by or on behalf of" contestee so as to make such expenditures in effect his. The test applied by the lower court is found in our statutes, sections 10774 and 10775, Revised Codes, and the quotation from the *Kohler Case,* supra. Because it states the rule to be applied so well in the

determination of the question here, we repeat what is said in that case: "There is no difficulty in understanding what is meant by the term 'by'; the phrase 'on his behalf' when it refers to a candidate means by some one who acts for him in the sense that an agent acts for and on behalf of his principal. The authority may be express or implied, but it must exist; otherwise the disbursement is not made on behalf of the person sought to be charged."

As has been stated, the court specifically found that the conduct of contestee and the deputy sheriffs and Gordon brought them within the definition above and within sections 10774 and 10775, Revised Codes. The court found that the deputy sheriffs and Gordon were "political agents" of contestee within the definition found in section 10775, that definition being: " 'Political agent' shall apply to any person who, upon request or under agreement, receives or disburses money in behalf of a candidate." The court found that although there was no direct evidence as to the agrecment required by the contestee and those making the expenditures in question, yet the circumstances set out herein lead to but one conclusion, and that conclusion is that such an agreement existed.

When all the circumstances, including the fact that the deputies were responsible to the contestee for their continued tenure of office; that in their official capacities they worked directly under his supervision; that they spent a great deal of their working hours during the campaign engaged in the distribution of the beer and merchandise hereinbefore referred to; that much of the merchandise in question was kept in the office of the contestee; that the bills for much of the merchandise delivered to the deputies were in the name of the contestee; that these bills passed over Johnson's desk in the contestee's office; and that the contestee himself distributed some of the merchandise; and his statements on the stand concerning his knowledge of the activities of the deputies; and his statements to the effect that he expected the deputies to campaign actively in his behalf; the disbursements for advertising, beer and merchandise through Johnson; and the testimony to the

effect that contestee personally was present during the times when the deputy sheriffs were distributing the items forbidden by law, furnished substantial evidence to support the court's finding that the deputies and Gordon were acting upon request or under agreement with the contestee, and that the expenditures made on his behalf were within the statute.

The court found in findings 9 and 10 that the contestee entered into agreements in writing with two firms for the purchase, first, from the L. W. Wendt Company of a quantity of handy menders; and, second, from the Monogram Pencil Company for a quantity of pencils. The testimony is that handy menders were folders containing needles and thread, and that on the folder appeared the following words: "Re-elect Guy Palagi Sheriff." The court found that the handy menders were articles of value within the provisions of section 10796, Revised Codes, and that their distribution constituted a violation of that section. In part that section provides: "Any person shall be guilty of a corrupt practice, * * * if he is guilty of * * * the giving, or promising to give, or offer of any money or valuable thing to any elector, with intent to induce such elector to vote for * * * any candidate for public office."

The court also found as to the second transaction, that the pencils were articles of value within this same provision. It found that these pencils and handy menders were distributed by the contestee and his deputy sheriffs as his political agents with the intent to influence votes contrary to the provisions of the Act. The agreements concerning these items appear as exhibits, and they bear the signature of the contestee. They do not appear in the account of the contestee, but in the purported club account; however, the testimony is that the contestee personally distributed at least a part of these items, and that the distribution was so widespread as to justify the court's finding No. 14, in which it found that they were not trivial, and that the distribution "was not limited in character, and did not arise from inadvertence or from accidental miscalculation, but the giving of said articles to the voters, as aforesaid, was prevalent during the campaign in that instances thereof oc-

curred in different election districts, similar in character and sufficient in number so that they were general and common.''

The evidence amply sustains the court's findings as to these articles. Contestee urges in this court that the pencils and handy menders were not articles of value within the provisions of the Act, and that they were merely advertising material and valuable only for that purpose. With this view we cannot agree. The dividing line is difficult to ascertain in some instances; however, these articles, it would seem, have a value distinct from that of ordinary advertising. For example, an ordinary political card would not be an article of value within the provisions of the statute, even though they cost the candidate a certain amount of money. Their only practical use is to carry the advertising message of the candidate. In the case of the handy menders or pencils, this is not true. They have a certain utility to the recipient which is real, and ordinarily they are not given away free but must be purchased. They are valuable to him aside from any advertising message they may carry, and it would seem beyond question that they come within the provisions of the Act.

The court found that as a part of the plan to secure the ▮▮▮▮ election of contestee by illegal means, large quantities of beer, cigarettes, chewing tobacco, smoking tobacco and snuff were purchased by the contestee and distributed by him and by his political agents for the purpose of influencing such voters to give their votes to contestee.

While there is a conflict in the evidence as to the contestee's direct connection with the physical act of distributing these items forbidden by the Act, yet there is testimony that he was personally present on a number of occasions when these items were distributed. This evidence, together with what we have said before in commenting on this phase of the court's findings, is amply sufficient to support its conclusions as to treating. That this treating was widespread in its scope, and that instances were not isolated and trivial appears from the testimony and from the quantity of the beer and other items distributed. The testimony is that cigarettes were distributed by the package, as

was the snuff and smoking tobacco, and that chewing tobacco was distributed by the plug. The record shows that beer was distributed not only by the bottle, but by the keg as well.

The court found that the total of expenditures by and on behalf of Palagi exceeded the amount allowed under the Corrupt Practices Act, which amount it found to be $350, and which we have heretofore discussed. It found that no club existed, as we have indicated, and that the expenditures listed in the so-called club account were actually the expenditures of contestee within the meaning of the Act. What we have said as to the court's findings as to the existence of the club disposes of the assignments of error predicated on its findings of excessive expenditures. The evidence amply sustains the court's findings and conclusions on this point.

The evidence being sufficient to sustain the findings of the court, and no error appearing, the judgment is affirmed.