## Claypool v. Hines.

Oct. 21, 1941.

Marshall Funk for appellant.

Rodes & Willock and Charles R. Bell for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Affirming.

At the Democratic primary held August 2, 1941, in the city of Bowling Green, the appellant, contestant below, received 1161 votes and the appellee, contestee below, received 2581 votes for the nomination for the office of mayor.

As grounds for contest it was alleged that the successful candidate had been guilty of violating the Corrupt Practice Act, Sections 1565b-1 to 1565b-21, inclusive, Carroll's Kentucky Statutes. The particulars of the violations alleged are divided by appellant into three classes; (1) false, fraudulent, and incomplete expense accounts, (2) expenditure of money in excess of the $500 limitation prescribed by Kentucky Statutes, Section 1565b-18, (3) bribery, and conspiracy to bribe voters.

The total of the pre-election and post-election expense account sworn to and filed by appellee amounts to the sum of $502.40, and exceeds the statutory limit in the amount of $2.40. But one of the items appearing in the post-election account in the amount of $10 is described in the account, and sworn by appellee and James

Gorin, to have been a donation to the campaign of the latter, a candidate for sheriff in the same primary. It is obvious that such a donation cannot be charged to appellee as an expenditure in his race for mayor. It should not have been reported in appellee's expense account, therefore, it is a proper deduction from it. Thus reduced, the expense account of itself fails to disclose a violation.

At the commencement of his campaign, appellee caused to be opened in the name of the Hines Campaign Fund a checking account with the Bowling Green Trust Company. H. B. Webb, treasurer of his campaign, had control of the account with the privilege of checking against it. The account shows deposits aggregating $1,871.14, and withdrawals totalling the sum of $1,852.80. Appellant asks us to declare appellee to have exceeded the limitation of expenditures prescribed by the statutes on the face of this evidence; but to do so would be to disregard the very positive evidence introduced by appellee in explanation of the withdrawals in excess of $492.40. The difference between the total amount of withdrawals, namely $1,852.80 and the reported expenditures of $492.40, amounts to the sum of $1,360.40. According to the undisputed evidence for appellee $500 of this sum was an unauthorized loan made by Webb to John O'Connor, John Meredith, and J. S. Cole, who after borrowing the money delivered it to Austin Claypool for use in the latter's campaign for the Democratic nomination for sheriff. The loan is evidenced by a note signed by the borrowers and the transaction was proven by the testimony of Webb and O'Connor, the latter disclosing the name of the teller of the bank who cashed the check and delivered the money to Austin Claypool. There is a total absence of proof that this money was pooled or in anywise used in the furtherance of the Hines' candidacy. $500 of the sum placed to the credit of the account was applied to the payment of a fee to the attorneys of record for appellee in this case. It is manifest that neither of the $500 items is chargeable as a campaign expenditure. The evidence discloses that after the primary election Mr. Hines made an audit of the bank account and discovered the account to be short in the amount of $360.40. Called to task and to give an account of the shortage, Webb confessed that he had embezzled the funds. Mr. Hines thereupon demanded that he evidence the fact by executing to him a note in the full amount,

which he did. These facts were testified to by Mr. Hines, were admitted in the testimony of Mr. Webb, and must be accepted by this court as proof sustaining the chancellor's finding that the $360.40 was not chargeable to appellee as money expended in behalf of his candidacy.

Appellant charges that Mr. Hines made an unreported expenditure of $30 to Perrin Turpin in payment of services rendered in the campaign. Mr. Turpin testified that he received $30 in payment of full-time services at the Hines' headquarters for one month preceding the primary election. Webb admitted giving Turpin one check for $5 and another for $25, but testified they represented personal loans, and the inference being that they came from a part of the embezzled funds. Lena Shockley, who was impeached, testified that for services rendered in the campaign she received from Mr. Webb $15 in addition to the amount reported by Mr. Hines. This was denied by Webb, and Mr. Hines testified that he knew nothing about it, if it happened.

The defalcation of Webb and the Turpin and Shockley incidents presented issues of fact to be determined by the chancellor which he has decided in favor of appellee. On appeal this court is not authorized to reverse that judgment if we entertain no more than a doubt as to its correctness. Smith v. Ward, 280 Ky. 173, 132 S. W. (2d) 762. The record fails to create that doubt in the mind of this court.

We are asked to charge to the Hines expense account an amount estimated at $15 for food and drinks served friends at political rallies. The evidence discloses the food to have been furnished by a Mrs. Cole, whose husband was running for the office of councilman in the same election, and the drinks were furnished without charge by two soft drink dealers in the city of Bowling Green. It is the general practice of candidates for office to engage in entertaining their friends on a more generous scale than they would under ordinary circumstances, but such entertainment, while expensive to the candidate, cannot be charged to him as a campaign expenditure unless the expenditure is for the purpose of corrupting the election. The refreshments served at these meetings were not in payment of any services rendered the candidate and the expense of such refresh-

ments must be classed in the same category as the "ginger snaps" in the case of Asher v. Broughton, 231 Ky. 165, 21 S. W. (2d) 260. We therefore conclude that the record fails to show the Corrupt Practice Act to have been violated by appellee either in regard to excessive expenditures or in respect to false, fraudulent or incomplete expense accounts.

Much evidence was introduced establishing beyond doubt that votes were bought in this election. But there is no evidence which would warrant us to reverse the finding of the chancellor that Mr. Hines knew nothing about these practices and did not engage in them himself. We will not extend this opinion unreasonably by relating all of the incidents which have been called to our attention, but will content ourselves with reference to two or three cases which most strongly support appellant's contention. There was one incident which occurred at the residence of Mr. Hines the afternoon of the election. He testified that some women came to his house and informed him that they had worked for him at the polls throughout the day and thought they should be paid $4 for their efforts. He paid them and testified that it was for the work they represented they had done and that he did not know how they voted nor for whom they voted nor did he pay them in consideration of any agreement on their part to vote for him. The $4 was reflected in his post-election expense account as an expenditure for workers. We do not believe that the incident was proof of such reprehensible conduct on his part as to justify a conclusion that he actually bought the votes in question. The only other evidence tending to connect Mr. Hines directly with knowledge of corruption was that given by Ella Overstreet and Alma Forshee, both of whom were impeached. Their testimony as to the time of the occurrence is very indefinite and unconvincing, but they were positive in their testimony that Mr. Hines gave each of them a dollar for her vote. Mr. Hines denied this evidence in its entirety. There was no other testimony tending to connect him directly with knowledge of illegal acts. Nor do we think that the record shows such flagrant and open corruption at the polls as to impute its knowledge to contestee. It was shown that he was at the polls for a few minutes each time in several precincts but it was not shown that he was in the presence of any person buying or selling votes at the time the votes were bought or sold.

The Corrupt Practice Act does not fasten liability on a candidate through imputed knowledge. Actual knowledge of illegal acts is an indispensable element to be established. Dyche v. Scoville, 270 Ky. 196, 109 S. W. (2d) 581, and an election will not be set aside unless facts are established by competent and substantial evidence fairly warranting the conclusion of guilt. Lewis v. Sizemore, 274 Ky. 58, 118 S. W. (2d) 133. The testimony of confessed vote sellers will be given no more credence than their character demands. One who will sell his vote generally will sell his testimony, which makes it comparatively easy for a contestant to purchase testimony; and we would be reluctant to declare an election void on the sole testimony of confessed vote sellers, especially when they have been otherwise impeached as in this case. Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504.

As said in Gross v. Cawood, 270 Ky. 264, 109 S. W. (2d) 597, 598, following the rule laid down in other cases therein cited:

"It has long been a rule of this court not to declare an election void and of no effect on account of a violation of the Corrupt Practice Act, except it be shown by unimpeachable evidence that the contestees violated the act itself, or that, with their knowledge, consent, or procurement, the act was violated by others for them."

The chancellor had an opportunity to see the witnesses in person and probably was personally acquainted with each of them. He is in better position to judge the weight to be given to statements of the individuals than we are and we feel that we should not reverse his findings on the uncorroborated testimony of two confessed vote sellers who in addition had been impeached.

From a careful consideration of all the testimony we are of the opinion that the chancellor's findings were supported by sufficient evidence to require this court to sustain the judgment.

Wherefore the judgment is affirmed.