# Smith v. Ward.

Oct. 20, 1939.

T. E. Moore, Jr., for appellant.

S. M. Ward, B. W. Baker and Scott Duff for appellee.

Napier & Napier, amicus curiæ.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

This appeal involves the outcome of the last primary election, insofar as was concerned the nomination of a Republican candidate for circuit judge in the thirty-third judicial district, composed of Perry and Leslie counties.

There were five candidates, appellant and appellee; C. W. Napier, J. Asher and C. A. Noble. Upon returns, appellant received the highest number of votes and S. M. Ward the next highest. Napier was third. In due time there were filed two contest proceedings, one by Napier making Smith, Ward and Asher defendants; Noble intervened.

In the other action Ward was plaintiff and Smith defendant, and while there was no order consolidating the cases, it seems that they were heard together, and the issues of fact determined in each case on proof introduced in both. We are not to be concerned on this appeal with argument over pleadings or procedure, though appellant complains of irregular procedure, but in brief expresses willingness to let his client's rights stand or fall on the merits of his contention. Appellee accepts the challenge.

Although Smith and Ward had received a greater number of votes than Napier, the latter sought to have the court award him certificate of nomination, on the ground that his opponents had violated the Corrupt Practice Act, Kentucky Statutes, Section 1565b-1 et seq., and that he was guiltless. After a great deal of proof the court, on September 14, 1939, adjudged in the Napier case:

> "That the plaintiff did not violate any of the provisions of the Corrupt Practice Act, and that the testimony shows that the defendant Smith and J. A. Asher each violated the provisions of said act, but plaintiff has failed to show that defendant S. M. Ward violated such act, and for that reason plaintiff is not entitled to any relief herein,"

and plaintiff's petition was dismissed. No appeal has been prosecuted from this ruling.

The judgment from which appeal is prosecuted was entered on September 13, 1939, and reads as follows:

"The court is of the opinion that the testimony does not justify the court in throwing out any precincts. The court is of the opinion that of the illegal votes cast in the primary, the plaintiff received more illegal votes than did the defendant, and it is not necessary for the court to make a ruling as to the alleged illegal votes, as they in no wise affect the result of the election between plaintiff and defendant, and that but for the violation of the Corrupt Practice Act on the part of defendant Smith, he would be entitled to the nomination. * * * But the court finds that the said Smith did spend money, and money was spent with his knowledge, consent and procurement for the purpose of bribing and corrupting voters to vote for him at the primary election, * * * and that by reason thereof the said Smith has forfeited his right to the nomination. The court further finds that the said Ward did not violate any provisions of said Act in seeking the nomination, and he is entitled thereto,"
and certification was directed.

In the petition filed by Ward against Smith, it was first asked that there be, and there was had, a recount of the ballots. In this recount Smith lost 9 votes, due to a failure of the proper officer to sign his name on various ballots. The recount reduced appellant's plurality to 52. The correctness of the court thus finding is not challenged.

After the recount the Ward case proceeded to a determination of the two other questions raised by Ward's pleading, to the effect that Smith had been the recipient of many illegal votes and by Smith's counter-charge to the same effect, and in both cases of violations of the Act.

The recount not having shown any effective change in the result, the court directed that proof be taken on the contested issues. It seems from the record that the first proof introduced, or at least considered by the court, related to the cross-allegations of illegal voting, though there was intermingled proof as to alleged violations of the Corrupt Practice Act.

As the introduction of proof proceeded, the court interrupted the taking of proof on the question of illegal voting, concluding from what had been adduced that Ward had been shown thus far to have received more

illegal votes than had Smith, and that it was unnecessary to consider the question of throwing out any particular or certain precincts, and counsel for appellant in their brief say: "We accepted his ruling and ceased further proof on the subject," and proceeded to introduce proof on the subject of violation of the Corrupt Practice Act, although the court had stated after he had expressed the above opinion, "That no knowledge of violation of the Corrupt Practice Act on the part of other persons could be imputed to Judge Smith, as the law and decisions of this court were uniform on the proposition."

The case then at the suggestion of the court, was argued, with the understanding that further proof might be introduced, but after argument and on proof already introduced, the court rendered judgment. The alleged precipitate ruling of the court, mentioned but not stressed in appellant's brief, is followed by this statement:

"We can stand on the record as it is and Judge Smith can be restored to his rights as the nominee, notwithstanding the decision of the court below."

In fact as we read the briefs the sole question presented is whether or not the court correctly held that appellant was disqualified by violating the Corrupt Practice Act.

At this point we may digress to pass on appellee's motion to dismiss the appeal of Judge Smith, which was passed for consideration to the case on merits. That motion is based on the ground that the judgment of September 14, in the Napier case, held in effect that Smith had violated the Corrupt Practice Act, which judgment was not appealed from, modified or vacated. That Smith and Ward were parties to the Napier action in which appellant was said to have been guilty of violation of the Corrupt Practice Act, and since appeal is only from the judgment in the Ward case, the judgment in the Napier case binds appellant, and his attempted appeal in the Ward case presents a moot question.

As we look to the record and the two judgments entered, we conclude that in the Napier case there was no judgment against appellant Smith from which he could appeal. The reference to Smith and Ward, insofar as that document is concerned, was not an adjudication. But, as will be later noted, we need not pursue this

discussion further, but conclude that the motion is without merit.

At a late date (October 18th) Napier, who was plaintiff in his action, has upon a sustained motion to be allowed so to do, filed a brief amicus curiæ in which he attempts to show an interest in the outcome of this appeal. He says that in case Ward should be adjudged guilty of having violated the Corrupt Practice Act, he, movant, would be automatically the nominee of the Republican party for the office sought, and there may be merit in his contention. But that contention might have been considered on appeal by him in his case, or had he intervened in the Ward-Smith case, and then come in by appeal or cross-appeal.

It will be perceived from what has been said that the only issue on the merits of the case—to a consideration and determination of which we have now arrived—is the single one of fact, i. e., whether or not appellant was guilty of violating the Corrupt Practice Act so as to deprive him of his nomination, notwithstanding he may have received a plurality of the legal votes cast in the primary.

We say that the question for determination is so limited because appellant's counsel expressly does so in brief on this appeal, and we are not disposed to burden ourselves with the disposition of issues abandoned.

Before determining the single issue of fact—and which the trial court found against appellant—we deem it proper to observe that evidence may consist of either express testimony from the lips of witnesses, or from circumstances strongly pointing in a particular direction.

Human nature, and human actions governed and prompted by it, are such that sometimes circumstances are more convincing than express testimony, and it is no uncommon or infrequent occasion when courts, in determining issues of fact, give weight to undeniable and established circumstances of the character indicated. Having said this much we will now proceed to a determination of the factual issue in the case, but in doing so it would be manifestly impracticable to notice in detail, and seriatim, the individual testimony of the great number of witnesses who testified on the sole issue to be determined.

Appellant had no organized campaign committee, but conducted his campaign from his room in the hotel where he lived, and where for a time prior to election day he was frequently visited by persons who were interested in his campaign, and by those whom he and his friends and co-workers undertook to, and did, interest in his behalf.. He says categorically, that he did not give, promise or loan money, or other property, to any person for the purpose of influencing voters, or to any voter for a like purpose. He specifically stated that he gave no money to any of his workers for such purpose, nor did he authorize any one else so to do. His brother and other relatives were very much interested in his behalf, and the record shows much activity on their part in furthering his ambition. Appellant says he did not furnish them any money, nor did he consult with them about money or the use of money.

The evidence is replete with open, bold and admitted evidence of buying of voters, the prevailing stipend being in most instances $1 per head. In several instances, and one in particular, appellant's workers were so open and bold in the purchase of votes, or in "pooling" with others for vote buying, that it could be noted by the casual observation of an ordinarily intelligent person.

The testimony undisputedly reveals these facts: That sometime prior to the day of the election appellant had effected an election day organization in his behalf with designated friends, some of whom were his brothers, to be present at designated precincts throughout the hours of the election. Many of them were furnished money by appellant, as he says, for the purpose of defraying legitimate and non-condemned expenses, but with which the workers, so selected and so furnished, openly and notoriously purchased votes for appellant; that on election day appellant selected friendly companions to accompany him in visiting precincts in his district, who were selected and so accompanied him in order for them to be able to testify that he, on such occasions and visits, did not himself violate the Corrupt Practice Act by purchasing votes. That conclusion and plan is alone sufficient to arouse suspicions of more than ordinary proportions.

There was also ample testimony to establish the fact that while on such visits, and when appellant and his companions were on the ground and about the voting

place, both selected workers for appellant, and others whom those workers had enlisted, were openly purchasing votes for him, but which was in the main done by a retiring to an ostensible place of safety, but which was but little removed from complete notoriety, and that it was practically impossible for appellant not to have observed such maneuverings, and especially so when many witnesses, occupying no more advantageous position than did appellant, observed such tactics and gave testimony to the circumstances.

The testimony as a whole, is most convincing that appellant was cognizant at the times of his visitations referred to, and also at the time of his distributing funds to his workers immediately preceding the election, that his money was to be and was being spent, by those to whom he had trusted it in other ways, and to the accomplishment of purposes other than purely innocent ones.

In the first place the amount given to be used at a particular precinct, was greater than was ordinarily necessary to defray legitimate expenses, and a potent fact, which may not be overlooked, is the denominations of the currency furnished by appellant to his workers, to some of whom he delivered as much as, or more than, $15. It consisted almost entirely of one dollar bills, which as we have said, was the current price demanded for purchased votes. Legitimate expenses could, in ordinary course, be defrayed without such meticulous preparation, but not so free from the task of making change and consequences of delay, and in transacting the purchase of a vote, and possible exposure incident thereto.

Counsel cite and discuss our rulings in Asher v. Broughton, 231 Ky. 165, 21 S. W. (2d) 260; Van Meter v. Burns, 176 Ky. 153, 195 S. W. 470; Prewitt v. Caudill, 250 Ky. 698, 63 S. W. (2d) 954; Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026; Scalf v. Pursifull, 250 Ky 447, 63 S. W. (2d) 504; Napier v. McIntosh, 220 Ky. 539, 295 S. W. 856, to which might have been added others of like import.

After all, our conclusion in those cases will establish that each case must be determined by its own facts and circumstances, as developed by the testimony. In some of them it will be observed we exercised great leniency toward the alleged violator and held him not

guilty, when, perhaps that conclusion was against the weight of the evidence. In them we gave effect to the denials of the alleged violator, notwithstanding his manifest interest in the cause, and permitted such denials to overcome contrary convincing testimony pointing to his guilt, when possibly it should not have been done.

After all, the issue of fact involved in this character of case is to be determined upon the same principles as similar issues in any sort of case. In determining such issues we take into consideration well established rules of human conduct in similar environments and circumstances, and we see no reason why that same course should not be pursued in determining the sole issue under consideration arising in an election contest case.

Applying that rule for the determination of the instant issue, we find it most difficult to conclude that from the various acts, activities and conduct of appellant, he was not made aware that the money advanced to be used in his behalf on election day, was not to be used or was not used for the purchasing of votes in his behalf. To hold otherwise would not only be a departure from the universal rule for the determination of factual issue, but as we conclude it would also run counter to human experience.

The Corrupt Practice Act was intended to accomplish a most commendable purpose, having for its object the preservation and purity of elections, through and by which those whom we trust with the performance of governmental functions are chosen to carry out our democratic form of government. If the process by which that choice is made (election in most instances) should become corrupt, it is more than likely that those chosen would likewise become contaminated.

We conceive it, therefore, to be the duty of the court to scrutinize the testimony in cases like this and when fairly convinced that the statute has been violated, and its purpose thereby thwarted, it should be so determined and the penalty provided in the statute applied. The trial court so concluded, and his judgment is to be treated on this appeal the same as that of a chancellor rendering a like decision. In reviewing such a judgment we are not authorized to reverse it if we entertain no more than a doubt as to its correctness. This record fails to create that doubt in our mind. On the contrary

we appraise it as passing beyond the stage of doubt into the field of conviction.

Having so concluded the judgment is affirmed.

The whole Court sitting.