### Gearheart v. Hill et al.

Oct. 21, 1941.

F. M. Burke for appellant.

Joe Hobson and W. W. Burchett for appellees.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

In seeking the Democratic nomination for the office of county judge of Floyd county in the August 1941 primary Edward P. Hill received 4597 votes; Doug Hays 2369; Orris Gearheart 1609; J. M. Clark 176; John Castle 106, and Basil Fleming 166. On Aug. 15th, Gearheart filed suit against Hill and Hays charging both with corrupt practices, and averring that he had not violated the Act, Kentucky Statutes, Section 1565b-1 et seq., and should be adjudged to be the nominee. On Aug. 16th Hays filed a similar contest proceeding against Hill and asked that he be adjudged the nomina-

tion. However, Hays dismissed his action shortly after it was filed.

Hill's answer to Gearheart's suit was a traverse followed by a counterclaim charging Gearheart had been guilty of corrupt practices and pleaded that he had not violated the Act and should be adjudged the nomination and that Gearheart be adjudged not entitled thereto. Hays' answer filed on Aug. 22d to Gearheart's suit was a mere traverse and did not allege in affirmative terms he had not violated the Act, nor did his pleading ask that he be adjudged the nomination. Hays tendered an amended answer on Sept. 30th which the court refused to order filed wherein he asked that he be adjudged the nomination. Hays did not appeal from the final judgment entered, hence it is not necessary to pass on the ruling of the trial court in refusing this amended answer.

The regular judge disqualified himself and Hon. T. C. Carroll was appointed by the Chief Justice as special judge to try the case. Since Hays' pleading did not entitle him to the nomination in the event Hill was disqualified he took no active part in the litigation and the real contest was between Gearheart and Hill. The court found in favor of Hill and while both Gearheart and Hays excepted to the judgment and prayed an appeal, Gearheart alone is prosecuting this appeal.

Hill moved to dismiss the appeal because the appeal bond executed by Gearheart and his sureties before the circuit court clerk read:

> "Now, we W. I. Myers and Miranda Gayheart sureties, hereby covenant with and to the Appellee *Dr. Orris Gayheart* (our italics) that the Appellant will pay to the Appellee all costs and damages that may be adjudged against the Appellant on the appeal. * * *,"

It is apparent that in filling out this bond the circuit court clerk inadvertently inserted Gearheart's name in this particular place as appellee; not only so, but he spelled his name erroneously. The caption of the bond names Gearheart as appellant and his name is there correctly spelled. Gearheart and his sureties signed the bond and the only irregularity therein is the place in which the clerk inadvertently named Gearheart as appellee. This inadvertence of the clerk does not vitiate

the bond. In Felts v. Edwards, 181 Ky. 287, 204 S. W. 145, it was written that where a word has been carelessly or inadvertently used, the purpose and intent of the Legislature will not be defeated by the inadvertence, but that the word intended will be substituted for the one used. What was there said applies here.

Hill's father had been elected three times as judge of the Floyd county court in the five races he made for that office. The appellee was seeking re-election and he knew how turbulent are politics in Floyd county and that elections there are not infrequently followed by contest litigation. In his judgment, he had his race easily won and thought he would receive more votes than all his opponents combined, which he did. He had no campaign manager and no formal organization, but was attempting to run his race separate and apart from the candidates seeking the nominations of other county offices. He appeared to be much concerned over so conducting his campaign efforts that there would be no grounds for contesting the result.

His father returned from his present home in Ohio two or three weeks before the election to assist Hill; also, his brothers, sister and wife assisted him in perfecting an election day organization to get his vote to the polls. Hill put from $10 to $30 a precinct in twenty-nine of the fifty-two precincts in the county to be used in getting out and transporting his vote to the polls. He sent these sums to the various precincts by members of this family, or else he personally delivered them to precinct workers supporting him, and Hill expressly warned them as well as members of his family that he had his race won and this money was to be used in getting his vote out; that it must not be used for any illegitimate purpose as he did not want a contest on his hands after the election. His post election expense account shows these sums and to whom they were paid.

Most of the money Hill thus sent to the precinct workers was in the form of $1 bills. He explains this by testifying he had made arrangements to borrow $300 from the bank; that he sent his wife for the money and the bank delivered to her the bills in that denomination. Also he borrowed $200 from a friend, who thinking he wanted to use the money in the election, gave it to him in small bills. While these are suspicious circumstances, we do not think they overcome the testimony of Hill, the

testimony of members of his family and the testimony of those who worked for him on election day, that his specific instructions were not to use any of his money for buying votes. The comparatively small amounts Hill placed in the twenty-nine precincts and the comparative uniformity of the amounts corroborates his testimony that the money was to be used for the legitimate purpose of getting out his vote. The evidence shows that at least two cars or trucks are necessary in each precinct in Floyd county to transport a candidate's vote to the polls and that to hire such vehicles cost on the average of $10 each. In some of the precincts where Hill did not expect to get much vote he did not furnish transportation.

There can be no doubt that some of the money sent to the polls by Hill was used to bribe voters to cast their ballots for him, but there is no evidence or circumstances in this record from which knowledge of this illegitimate use of money by members of his family or by his election workers may be inferred to Hill. Knowledge of misconduct may be inferred from the circumstances, but in the absence of proof that corrupt conduct was authorized or ratified by the candidate, he is not liable for such conduct on the part of his relatives or supporters. Such corruption may not be imputed to the candidate from the wrongful act itself. Caudill v. Prewitt, 250 Ky. 698, 63 S. W. (2d) 954; Lewis v. Sizemore, 274 Ky. 58, 118 S. W. (2d) 133; Wheeler v. Marshall, 280 Ky. 55, 132 S. W. (2d) 519.

Counsel for appellant discusses our opinions in Charles v. Flanary, 192 Ky. 511, 233 S. W. 904; Asher v. Broughton, 231 Ky. 165, 21 S. W. (2d) 260; Smith v. Ward, 280 Ky. 173, 132 S. W. (2d) 762; Howard v. Whittaker, 250 Ky. 836, 64 S. W. 173; Horn v. Wells, 253 Ky. 494, 69 S. W. (2d) 1011, and perhaps other cognate cases. In reference to election contest cases it was written in Smith v. Ward [280 Ky. 173, 132 S. W. (2d) 765]: "Each case must be determined by its own facts and circumstances, as developed by the testimony." It is urged for appellant that the facts in the instant case cannot be distinguished from those in Smith v. Ward. With this we cannot agree. After Smith gave money to election workers for the ostensible purpose of meeting legitimate expenses, he saw these very workers at the polls openly purchase votes for him, or at

least other persons occupying no more advantageous positions than Smith saw votes purchased for him; and we held that it was impossible for Smith not to have known that his money was being used for corrupt purposes. In the instant case, workers to whom Hill gave or sent money with an admonition it was to be used only for legitimate purposes, used it to bribe voters, yet there is no evidence or circumstances in the record showing this was done in his presence or that Hill knew his money was being put to such illegitimate use. When Hill wanted to send money to a precinct by his brother-in-law, Clark, to be used legitimately and the latter told Hill he would use his own funds for that purpose, this did not give Hill notice that Clark was to use money for the purpose of corrupting voters.

A few days before the election Hill sent $25 to a relative, Josephine Hill Hall, with the request that she work her precinct in his behalf in getting out the vote, and that she might retain $10 of the money for expenses and as compensation for her time. This is not sufficient to condemn him of corrupt practice. Nor was corrupt motive shown by the fact that he directed one of his workers to pay a school girl daughter $5 out of $30 left with the worker for the purpose of getting out his vote. It is almost common knowledge that candidates often pay some energetic, likeable person $10 or $15 for going through a precinct a day or so before the election to create interest and enthusiasm in his behalf; also, that young girls in their late teens are employed to pass out the candidate's card at the polls.

Hill cannot be condemned of corrupt practice or of paying money for the purpose of purchasing votes for a slate because persons with whom he placed the $10 to $30 a precinct for legitimate expenses handled this money corruptly against his admonition, or because such persons without Hill's knowledge or consent placed this money with that of other candidates to form a pool and purchase votes for a slate. Hill testified he slated with no candidate and did not know the workers with whom he placed his money were handling money for other candidates. There is some testimony that the persons with whom Hill entrusted his funds were known election workers and that it was their reputation that they handled money corruptly in politics. But in the circumstances of this case where Hill in good faith admonished

them to use his money only for legitimate purposes and he had no knowledge that they were using it for corrupt purposes and where there are no facts or circumstances in the record to bring home to Hill such knowledge, we must agree with the trial judge that knowledge of such corrupt practice cannot be imputed to Hill.

One cannot read this record without being impressed with the fact that Hill testified with candor. He voluntarily divulged much information which was not calculated to help his cause. He was certain in his own mind that he had his race won and it is apparent he was attempting to hold his family and friends in check to prevent them from spending money illegally in his behalf. When without his knowledge or acquiescence they refused to follow his advice and when he in no way ratified their illegal actions, we cannot say he should be deprived of a nomination he won by a tremendous majority because of the indiscretion of relatives and friends. The $876 he expended was well within the statutory limit and had he any intention of using money corruptly he would have made but little showing in the fifty-two precincts in Floyd County where this record shows money was used in great abundance in the August primary.

The judgment of the circuit court in election contest cases is entitled to some weight. Runyon v. Trent, 270 Ky. 134, 109 S. W. (2d) 396; Dyche v. Scoville, 270 Ky. 196, 198, 109 S. W. (2d) 581. We have no doubt but that the trial judge weighed the evidence with great care and we are of the opinion that he reached the correct conclusion, therefore his judgment is affirmed.