STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. GEORGE W. ROGERS, DEFENDANT-APPELLANT.

Argued May 31, 1955—Decided June 27, 1955.

See also 30 *N. J. Super.* 239, 104 *A.* 2d 89.

*Mr. Maurice A. Cohen* argued the cause for appellant (*Mr. Abraham Miller*, on the brief).

*Mr. Frank J. V. Gimino*, Assistant County Prosecutor, argued the cause for the State (*Mr. Frederick T. Law*, County Prosecutor; *Mr. William A. O'Brien*, Assistant Prosecutor).

The opinion of the court was delivered by

WACHENFELD, J. The defendant, Rogers, was convicted of murder in the first degree with a recommendation of life imprisonment. He appeals from the judgment of a life sentence, contending there was error in the refusal of the trial court to allow the number of peremptory challenges to prospective jurors granted by statute; in the admission of certain exhibits and testimony which substantially prejudiced his rights; in the refusal to dismiss the indictment and grant a motion for acquittal; and in charging the jury they might take into consideration the failure of the defendant to take the stand.

There were two indictments, the first charging the defendant with the murder of William Hummel and the second charging the defendant with the murder of Edith Hummel, who was William's daughter. By stipulation, both indictments were consolidated and the trial proceeded as one case.

The State's case is based entirely on circumstantial evidence and one of the main inquiries is whether or not certain testimony and exhibits were too remote to permit their admission into the record at the trial.

Some time before 10 A. M. on the morning of June 19, 1953 the defendant, George W. Rogers, drove his close friend, William Hummel, to the First Savings & Loan Association at 26th Street and Broadway in the City of Bayonne. Hummel withdrew $2,400 in cash from his savings account, receiving three or four $100 bills and the balance in $20 bills. The bank teller who waited on him on this occasion was the last person who saw Hummel alive.

Hummel, 71 years of age, lived with his unmarried daughter, Edith, in a one-family dwelling which he owned at 582

Avenue E in Bayonne. Prior to June 19 he had sold the house and was making preparations to move to Florida. He had made arrangements to visit relatives living in Bloomington, New York, on June 20 and for that purpose had purchased two round-trip bus tickets to Bloomington for himself and his daughter on June 16.

When the Hummels did not arrive in Bloomington as scheduled, the relatives they were to have visited became concerned and on June 24 wrote to a sister of Hummel who lived in Jersey City, requesting she look into the matter. This inquiry resulted in two brothers-in-law going to the Hummel home in Bayonne on July 1. The house was closed and there was no response to their knocking and bell-ringing. They made inquiry of the neighbors, including Rogers, who lived diagonally across the street from the Hummels, as to whether they had seen or knew of the Hummels' whereabouts. Rogers told them he had given Hummel a ride to the bank on the morning of June 19 but said he had not seen or heard from him since.

The brothers-in-law went to the Bayonne police on the same afternoon and submitted their problem to them. In their company, the police went to the Hummel home and broke into the house. They discovered the badly decomposed body of William on the floor of the dining room and in a rear bedroom on the second floor they found the body of Edith in like condition, partly under a bed. It was evident both had been dead for several days, and the autopsical report and subsequent testimony showed they had died of fractured skulls produced by violent blows to the head. The condition of the bodies made it impossible to estimate the approximate time of death.

The following is a resumé of the facts and evidence relied upon by the State to prove its circumstantial case. Attempting to establish the probable time of death of the Hummels, the State produced John Joseph Harding, a newsdealer who operated a store in the vicinity of the Hummel home. He testified that for the past 20 years it had been William Hummel's regular practice to pick up his morning newspaper at

the store at about 10 A. M. but on the morning of June 19 Hummel did not appear nor was he seen thereafter.

Two newsboys who regularly delivered afternoon newspapers to Hummel's home testified they delivered a newspaper there at 4:30 in the afternoon of June 19. This being a Friday, the day they usually collected for the papers delivered during the week, they rang the doorbell of Hummel's home but it remained unanswered. So they pushed the paper through the slot of the outer door on the front porch.

At 6:30 on the same evening and again on the following morning one of them returned to Hummel's home and made further effort to collect for the papers but received no response to the ringing of the bell. On each subsequent weekday thereafter until the bodies were discovered he continued to leave an afternoon paper, although he could see the previous papers as well as the mail had accumulated on the porch.

Upon this evidence the State theorized the Hummels had been murdered sometime between 10 A. M. and 4:30 P. M. on June 19, and the date of death, as we shall see, is an important element in the chain of circumstances pointing to the guilt of the defendant.

The State's evidence demonstrated quite clearly that the defendant was a close friend of Hummel's and a frequent visitor to his home. This relationship was common knowledge in the community and it was because of it that Hummel's brothers-in-law made inquiry of Rogers on July 1 as to the Hummels' whereabouts. In fact, the relationship was so close that at some time prior to June 19 Rogers and his wife were given a key to Hummel's house and on past occasions when the Hummels were away on vacation they had visited the house.

Rogers and Hummel also had financial dealings with one another. Between May 1, 1947 and November 3, 1949 Hummel advanced to Rogers a total of $7,534.66 which Rogers was to have used in the purchase of surplus war material and kindred transactions. These matters were recorded in a typewritten statement prepared by Hummel prior to his death (S-43) found in his home following the murders. It was

established by expert testimony the statement had been typed on an old Underwood typewriter owned by William Hummel, but the State was unable to fix the date on which it was typed, although from the matters reported therein it apparently must have been typed subsequent to November 3, 1949. The concluding paragraph of this statement read:

"It may have been unwise on my part to continually advance money but said Rogers is very temperamental and I was in constant fear that he might have renegged on the purchase from the WAA and I would be in danger of losing everything * * *."

It was the State's theory at the trial that the transactions referred to in the statement, two copies of which were introduced in evidence, differing only slightly in their contents, over the objection of the defendant, were loans from William Hummel to Rogers. Rogers, it was contended by the State, was motivated, at least in part, in murdering Hummel by a desire to wipe out the obligation on these loans. Further supporting this theory, the State proved Hummel's canceled checks, payable to Rogers and evidencing these loans, were missing from the envelope found in Hummel's home after the discovery of the bodies. The identity of the missing checks was established through the stubs found in Hummel's check books.

The State proved that on June 19, 1953 and for some time previous thereto the defendant was in limited financial circumstances. It was shown the three savings accounts maintained by Rogers and his wife in a Bayonne bank contained a total of $20.88 and no transactions had been made in these accounts for several years. Rogers had no other bank account in Bayonne and for a number of years had borrowed money from small loan companies in the city. There was a law suit pending against him for a business debt and he was indebted to several other firms from which he had purchased material used in his business, plus the fact that he was also paying off a small balance on a note held by a New York bank.

Although Hummel had withdrawn $2,400 in cash from the bank on the morning of June 19, a diligent search by the

police of the Hummel home after the discovery of the bodies revealed no portion of it. There was evidence by the State to show that between June 22 and June 30 Rogers paid out a total of $1,006.51 in connection with various business and loan transactions and that on June 30, 1953 he purchased certain equipment at the Continental Sales Company, Inc., in Newark which he paid for with three $100 bills.

Another witness identified a typewriter which was found in Rogers' home as the typewriter Hummel had purchased about a month before his death.

There was offered in evidence a pair of grey trousers which a detective had found in Rogers' home after the discovery of the bodies. A witness, Paul Scheff, identified the trousers as those which Rogers had worn practically every day for more than two years prior to June 19. He also testified that when he saw Rogers on June 20 he was wearing a pair of khaki trousers. The chemist who examined the grey trousers at the request of the police testified they had recently been washed but there was still a stain of blood on them although he was unable to say whether it was human blood or how long it had been there.

Scheff testified he had a conversation with Rogers on June 22, some eight days prior to the discovery of the bodies and before anyone knew the Hummels were missing or had been murdered, in which Rogers said:

"* * * that they had somewhat of a mystery in their neighborhood; that he had picked this Mr. Hummel up and taken him to the bank and Mr. Hummel had tickets to visit someone in New York somewhere and they had sold his home and that he was going up there and no one has seen or heard of him since, and he was wondering why the people in New York hadn't done something, or somebody hadn't done something to find out as to their whereabouts."

Forest, an insurance agent, testified Rogers was a custom r of his and he had a conversation with him on the front porch of his home on the same day, to wit, June 22, in which Rogers asked him if he had seen the Hummels recently, which Forest answered in the negative.

These main facts, their relationship to one another and other details presented, their significance, their worth, and the inferences from them, will be alluded to hereafter.

■ First, it is said, the defendant was substantially prejudiced by the court's refusal to allow him 40 peremptory challenges. It is insisted both the statute and the rule accorded him 20 challenges for each murder indictment being tried.

The contrary, we think, is quite obvious. The statute, *N. J. S. 2A :78–7*, recites:

"Upon the trial of any action in any court of this state, the parties thereto shall be entitled to peremptory challenges as follows:
*          *          *          *          *          *          *          *
(c) Upon an indictment for  *  *  * murder  *  *  * a defendant, if tried alone, 20; if 2 or more defendants are tried together, 10 each; the state, 6 peremptory challenges for each 10 allowed to the defendants."

This is bolstered by *R. R.* 3 :7–2 (*c*), which provides:

"If the offense charged is for  *  *  * murder  *  *  *, the defendant is entitled to 20 peremptory challenges when tried alone, and to 10 such challenges for each defendant when tried jointly. In such cases the State shall have 6 peremptory challenges for each 10 afforded the defendant or defendants."

The rule prescribes the number of peremptory challenges to be allowed not on the basis of the number of indictments involved in the trial but on the character of the offense and the number of defendants. While the statute does speak in terms of "an indictment," the prefatory language of the statute, "Upon the trial of any action," specifically limits the parties to but one set of peremptory challenges in a single trial. Certainly it is clear that the number of peremptory challenges under both the statute and the rule is not to be multiplied by the number of indictments being tried unless each indictment is separately tried. Here, however, the indictments were tried under a stipulation that they be "consolidated for trial as one case."

■ Additionally, the record shows the defendant did not even exhaust the 20 peremptory challenges allowed him, so he could not have been substantially prejudiced by the trial

228

court's ruling, as he now asserts. *Cf. State v. Rios*, 17 *N. J.* 572, 592 (1955).

█ Next it is said the evidence of the financial relationship between the deceased, William Hummel, and the defendant was improperly admitted and the court was guilty of an abuse of discretion in admitting exhibits and testimony of business transactions between the deceased and the defendant from May 1, 1947 to November 3, 1949.

In substance, they showed Hummel had advanced to Rogers a total of $7,534.66, but the defendant urges these matters were too remote since the most recent transaction had taken place 3½ years before the murders and should therefore have been excluded. He acknowledges, however, that the purpose of the evidence was to supply a motive for the crime.

█ In criminal prosecutions, whenever the motive or the intent of the accused is important and material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in the support of other issues. *Hendrickson v. People*, 10 *N. Y.* 13, 31 (1854). Otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist. Such intent or motive may be proved either by direct or circumstantial evidence. All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him although they may have occurred previous to the commission of the offense. *Glaser v. United States*, 315 *U. S.* 60, 62 *S. Ct.* 457, 86 *L. Ed.* 680 (1942); *Little v. United States*, 73 *F. 2d* 861, 96 *A. L. R.* 889 (10 *Cir.*, 1934); *People v. Strause*, 290 *Ill.* 259, 125 *N. E.* 339, 22 *A. L. R.* 235, 252 (*Sup. Ct.* 1919); *People v. Thau*, 219 *N. Y.* 39, 113 *N. E.* 556, 3 *A. L. R.* 1537 (*Ct. App.* 1916); *Wigmore, Evidence*, § 389; 20 *Am. Jur., Evidence*, § 340.

Certainly the inference which the prosecution drew—that the loans which Hummel had made to the defendant had

never been repaid—was a fair one. The defendant had the opportunity, if he wished, to rebut the inference so drawn by taking the stand in his own defense or producing documentary evidence to the contrary. He availed himself of neither. Moreover, the inference that the loans had never been repaid was supported by the evidence that someone had removed the cancelled checks representing most of these transactions from the records kept by Hummel, and this evidence lends convincing weight to the prosecution's suggestion that the existence of the loans formed part of Rogers' motive in committing the murders.

The fact the last loan transaction had occurred more than 3½ years before the murders did not make the evidence remote in establishing the defendant's motive. The debt itself still existed on the date the Hummels were murdered and the incentive to erase it was not diminished by the fact that the debt had been contracted earlier.

■ The question of remoteness is to be decided by the trial court as a matter of discretion, and the determination so made is not reviewable unless it appears there was a palpable abuse of discretion. *State v. Swiller*, 91 *N. J. L.* 345 (*E. & A.* 1917); *State v. Tansimore*, 3 *N. J.* 516, 517 (1950); *State v. Shiren*, 9 *N. J.* 445 (1952); *State v. LeFante*, 14 *N. J.* 584 (1954).

Applying the rules so enunciated in the above authorities, we are unable to conceive an abuse of discretion on this phase of the trial warranting a reversal. The evidence, although relating to a time prior to the incident involved, nevertheless was material and had a tendency to explain conduct which would otherwise probably be unexplainable.

■ The same reasoning applies to the objection made to the admission of evidence relating to the status of the defendant's savings accounts. This formed an integral part of the State's proof of the defendant's motive and of the commission of the offense itself. An inference could well be drawn from it that the defendant was in need of money and the funds he spent during the week following the murders were not his own.

■ It is also urged the admission in evidence of the grey trousers constituted prejudicial error. It is insisted there was not enough corroborative evidence to show that the trousers had anything to do with the commission of the crime itself or indeed were even owned by the defendant, and it is suggested they might have belonged to a boarder who lived in Rogers' home.

However, two witnesses positively identified the trousers as those which Rogers had worn for more than two years prior to June 19, 1953, and again we must emphasize that the defendant declined the opportunity to take the stand in his own behalf and deny the ownership of them or explain the blood spot testified to.

As to the relationship of the trousers to the commission of the murders, admittedly the trousers considered by themselves would not establish the defendant had committed the murder of either William or Edith Hummel. The State's expert was unable to identify the stain as human blood and, of course, could not identify the blood as belonging to either of the Hummels. However, the fact that the defendant had ceased to wear these trousers after June 19, after having worn them every day for a period of two years, that there was a blood stain on them and that an attempt had been made to wash the blood stain out with a strong alkaline solution, taken together with all the other evidence linking the defendant to the commission of the crime, certainly presents proper evidentiary material for the consideration of the jury. See *State v. Catania*, 102 *N. J. L.* 569 (*Sup. Ct.* 1926). As was said in *People v. Jeffers*, 372 *Ill.* 590, 25 *N. E. 2d* 35, 37 (*Sup. Ct.* 1940):

"The test of the admissibility of evidence is whether it fairly tends to prove the particular offense charged. * * * Any circumstance may be put in evidence which tends to make the proposition at issue either more or less probable."

Only recently in *Miller v. Trans Oil Co.*, 18 *N. J.* 407, 413 (1955), we set forth the broad principle which both encompasses and disposes of the defendant's objections:

"Justice and common sense, fused by enlightened reasoning, engender a legal philosophy embodying the abolition of all obstacles having a tendency to deprive the jury of any facts, however remotely relevant or from whatever source, which gravitate toward assisting them in arriving at a correct solution of the factual equation confronting them. Intellectual productiveness is not increased nor is the truth maintained by withholding circumstances which may shed some helpful light."

■ Next, the defendant urges there was error in the court's denial of his motions to dismiss the indictments and for judgment of acquittal. In so far as indictment No. 148, involving the death of Edith Hummel, is concerned, it is insisted no evidence whatever connected the defendant with the murder of Edith Hummel; she advanced no money to Rogers; there was no debt existing which would be wiped out by her liquidation, and there was no evidence that she had any money which could possibly have been a motive for the robbery.

All of this is true. If it could reasonably be inferred that her murder was not committed by the same person who killed her father, the State failed to present a *prima facie* case against Rogers in connection with her killing. However, we fail to see how such an inference could be drawn from the evidence at hand. It is perfectly obvious, we think, to anyone who examines the full factual developments as they occurred that the person who murdered Edith was the same person who murdered her father. The method of elimination was the same brutal approach in each instance; they were in the same household at the time, although in separate rooms, and her removal was, in all likelihood, necessary to silence an eyewitness to the murder of her father.

■ Hence, if the evidence was sufficient to create a question of fact for the jury as to the murder of William, then certainly there was a compelling circumstantial relationship between the murders to justify the submission of the daughter's murder for its consideration as well.

■ Admittedly, if the proofs were insufficient to make out a case for the jury at the close of the State's case, then a motion for acquittal should have been granted. The test

on a motion of a defendant for judgment of acquittal is whether there is any legal evidence before the jury from which an inference of guilt can be legitimately drawn. *State v. Picciotti*, 12 *N. J.* 205 (1953); *State v. Bricker*, 99 *N. J. L.* 521 (*E. & A.* 1924); *State v. Fox*, 12 *N. J. Super.* 132 (*App. Div.* 1951).

██ If the State relies, as it often does, upon circumstantial rather than direct proof, the trial judge is obligated to accord to the State's case the benefit of all legitimate inferences of which the proof is susceptible, and to determine whether the evidence, if believed, is inconsistent with any other rational conclusion save that of guilt. *State v. Donohue*, 2 *N. J.* 381, 390 (1949); *State v. Rhams*, 14 *N. J.* 282, 285 (1954); *State v. O'Shea*, 28 *N. J. Super.* 374, 378 (*App. Div.* 1953), affirmed 16 *N. J.* 1 (1954). And in coming to such a conclusion, each piece of proof is not to be dealt with in severe isolation from the rest of the circumstances submitted but is to be adjudged and weighed as it relates to and is associated with all other relevant circumstances which comprise the State's case.

The following salient circumstances impress us as proving the guilt of the defendant: up to the time of the murders Rogers was in need of money; he knew William Hummel intimately, visiting him at his home continuously and often; Rogers was the recipient of Hummel's financial advancements, and it is fair to assume from the proof he had knowledge of the fact that Hummel had withdrawn the $2,400 from his savings account. Hummel's death marked the transition from Rogers' impecunious status to his ability to spend comparatively large sums of money almost immediately thereafter, including one purchase which he paid for with three $100 bills, the noticeable denomination received by Hummel from the bank. The missing canceled checks which would have furnished evidence of Rogers' indebtedness to Hummel supplied not only a motive for the murders but, inferentially, evidence of Rogers' presence in the victims' home, as was his possession of Hummel's typewriter.

Then, too, significantly enough, Rogers disclosed intimate

knowledge of the fact that the Hummels never went to Bloomington on the 20th as they had planned, and apparently was possessed of such information long before the relatives who were supposed to be visited advised the family generally that the Hummels had never arrived. How could he have acquired this information so early if he did not commit the crime? Isn't it fair to assume these utterances were produced by the gnawing of a guilty conscience?

With the exception of the bank teller, Rogers was the last person to see Hummel alive, and yet when the victims' relatives informed him they were unable to get a response at Hummel's home, Rogers, despite his long friendship, showed no interest and remained inactive and indifferent. The condition of the house disclosed that Hummel's murderer had not forced an entry into it, and the evidence showed Rogers had a key which would have given him free access. The money Hummel had withdrawn from the bank was missing, evidently taken by the intruder who committed the murders.

The meaningful deviation in habit in connection with the grey trousers worn by Rogers for a long period of time before but changed with the occurrence of the murders, their subsequent discovery, the blood stain on them, and the evidence of the unsuccessful attempt at eradication by washing—all these circumstances and their pregnant implications, plus the defendant's refusal to testify or explain, dictate the same answer concluded by the jury.

The indelible impression is steadfast that no one else was interested in the death of these two humble beings and would benefit thereby except Rogers. The evidence, we believe, in the instant case meets the exacting standard referred to in *State v. Donohue, supra*, 2 *N. J.*, at *page* 389–390, where we said:

"It is too well settled to require further comment that conviction may be had on circumstantial evidence alone provided the evidence is so clear and strong as to convince the jury, beyond reasonable doubt, of the guilt of an accused. * * *

In order to justify a conviction on such evidence, all the circumstances not only must concur to indicate a defendant's guilt but they must also be inconsistent with any other rational conclusion.

It is not enough that they coincide to render probable the hypothesis advanced by the prosecution; they must also exclude beyond a reasonable doubt every other hypothesis except that of guilt.   *   *   * Where the essential facts are proved, and where they cannot be rationally explained on any theory other than that the defendant is guilty of the crime charged, such circumstantial evidence will be considered as convincing as evidence of a direct and positive character."

So long as the evidence is of sufficient quality to generate in the minds of the jurors a belief and conviction of guilt beyond a reasonable doubt, it matters not whether direct evidence of guilt is present. *State v. Boyd*, 137 *N. J. L.* 23, 26 (*Sup. Ct.* 1948), affirmed 137 *N. J. L.* 615 (1948).

The mistaken distrust of circumstantial evidence which enveloped the thinking of the bar and the courts at an earlier time has long since disappeared and it is generally recognized that such evidence may frequently be more trustworthy than direct testimonial proof. In 1846, the Pennsylvania Supreme Court said in *Commonwealth v. Harman*, 4 *Pa.* 269, 271 (1846):

"*   *   *   Circumstantial evidence is, in the abstract, nearly though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger. A fact positively sworn to by a single eyewitness of blemished character, is not so satisfactorily proved as is a fact which is the necessary consequence in a chain of other facts sworn to by many witnesses of undoubted credibility.   *   *   *   The only difference between positive and circumstantial evidence is, that the former is more immediate, and has fewer links in the chain of connection between the premises and conclusion; but there may be perjury in both. A man may as well swear falsely to an absolute knowledge of a fact, as to a number of facts from which, if true, the fact on which the question of innocence or guilt depends must inevitably follow.   *   *   *   All evidence is more or less circumstantial, the difference being only in the degree; and it is sufficient for the purpose when it excludes disbelief.   *   *   *   [T]he law exacts a conviction whenever there is legal evidence to show the prisoner's guilt beyond a reasonable doubt; and circumstantial evidence is legal evidence."

See also *Commonwealth v. Webster*, 5 *Cush.* 295, 311 (*Mass.* 1850).

More recently, Judge Learned Hand had occasion to say in *United States v. Becker*, 62 *F.* 2d 1007, 1010 (2 *Cir.*, 1933),

in holding that a charge as to circumstantial evidence was unnecessary:

> "Some courts have held otherwise. * * * The requirement seems to us a refinement which only serves to confuse laymen into supposing that they should use circumstantial evidence otherwise than testimonial. All conclusions have implicit major premises drawn from common knowledge; the truth of testimony depends as much upon these, as do inferences from events. A jury tests a witness's credibility by using their experience in the past as to similar utterances of persons in a like position. That is precisely the same mental process as when they infer from an object what has been its past history, or from an event what must have preceded it."

See also *Lukon v. Pennsylvania R. Co.*, 131 *F.* 2d 327 (3 *Cir.*, 1942); *Smith v. Ward*, 280 *Ky.* 173, 132 *S. W.* 2d 762 (*Sup. Ct.* 1939); *United States v. Valenti*, 134 *F.* 2d 362, 364 (2 *Cir.*, 1943).

Returning to the case at hand, the chain of facts and circumstances presented, taken in their natural sequence, excluding all except the logical and convincing inferences dictated by caution and sound sense, yields a vivid, abiding conviction of guilt, crowding out any reasonable doubt by its firmness and finality.

The story involved is not pretty. Murder never is. But when it concerns the slaying of a personal friend and liberal benefactor, it takes on its ugliest and most revolting aspects.

Lastly it is said there was error in the court's charge to the jury as hereinafter detailed.

██ Ever since *Parker v. State*, 61 *N. J. L.* 308 (*Sup. Ct.* 1898), our practice has permitted comment by the prosecution and the court upon the silence of the accused. As Mr. Justice Brennan said, in summarizing our rule in *State v. Costa*, 11 *N. J.* 239, 255 (1953), such remarks are proper where "* * * there are facts in evidence concerning the acts or conduct of the defendant within his personal knowledge which are inculpative or imputative in some degree of guilt, which facts he by his oath can deny." Charges to the jury embodying this principle have become a fixture of our criminal law.

█ To the general principle, however, an exception has been engrafted: where the prosecution's evidence is wholly circumstantial, the jury may not infer from the silence of the accused that he cannot deny the ultimate fact in issue—his guilt of the crime charged; the area of permissible inference from his silence is in such cases confined only to facts within his knowledge which, if true, would tend to establish his guilt. The jury may properly infer from the defendant's silence that the facts from which an inference of guilt may be drawn cannot be denied by him. *State v. Edelman*, 19 *N. J. Super.* 350 (*App. Div.* 1952); *State v. Marinella*, 24 *N. J. Super.* 49 (*App. Div.* 1952).

█ Scheff, a witness for the State, testified to a conversation with the defendant on June 22 in which Rogers evinced considerable knowledge about the failure of the Hummels to arrive in Bloomington on the 20th as scheduled. The important incriminatory inferences to be drawn therefrom we have already referred to. The occurrence of this conversation was a fact within the personal knowledge of the defendant, and his failure to take the stand and deny he had so spoken raises the presumption against him mentioned in the court's charge.

The court instructed the jury as follows:

"Where there is direct evidence of facts within the personal knowledge of the defendant tending to implicate him circumstantially with the offense charged, failure to testify with relation to those facts raises a strong presumption that he could not truthfully deny those facts. * * *

Where evidence is merely circumstantial, so that the defendant could only meet such evidence by a general denial of the charge, he does not have to testify and he cannot be criticised for such refusal to testify nor can the jury infer any guilt from his failure to give evidence.

I charge you that is the law but in view of the fact I have also charged another request by the State, I think perhaps I should dwell upon that a little further. There have been several important decisions by our upper courts with respect to the comment which might properly be made and the inferences which might properly be drawn from the defendant's failure to testify in his own behalf. Now keep in mind, ladies and gentlemen, that this is a case wherein the State depends entirely upon circumstantial evidence to prove the guilt of the accused; and so this twenty-fifth request to charge

which I have just read you is a perfectly proper and legal exposition of the law. I will repeat it: 'Where evidence is merely circumstantial, so that the defendant could only meet such evidence by a general denial of the charge, he does not have to testify and he cannot be criticized for such refusal to testify nor can the jury infer any guilt from his failure to give evidence.' In other words, the circumstantial evidence in this case tended to prove, or was offered to prove that this defendant was guilty of the crime of murder. Well, since all the evidence in the case is circumstantial—nobody came on the stand and said, 'I saw Rogers murder somebody,'—since it is circumstantial evidence there is no particular occasion for the defendant to take the stand and say, 'I did not murder Edith Hummel; I did not murder William Hummel'; but there is a different additional rule which the State asked me to charge, and which I did charge, and that may confuse you. I will repeat the State's request to charge number six: 'Where there is direct evidence of facts within the personal knowledge of the defendant tending to implicate him circumstantially with the offense charged, failure to testify with relation to those facts, raises a strong presumption that he could not truthfully deny those facts.' Well, there has been evidence in this case that certain things—I will take one of the simpler ones so as to keep us out of trouble—take the testimony by Paul Scheff that Rogers came in and gave him that stool for a Father's Day present. How important that is is for you to determine. In any event, if Rogers gave Scheff that stool or if he didn't, Rogers knew it, and he could have taken the stand and said, 'I deny it.' I think I have put it to you very simply. I will not go into it further."

The charge was wholly in accord with the principles above enunciated and communicated the law to the jury in language which was simple and well within their grasp and comprehension.

The defendant, however, urges the jury may have been confused by the example used by the trial judge—his reference to the testimony concerning the defendant's gift of a stool to Scheff—to illustrate the operation of the rule.

Concededly, Scheff's testimony as to this occurrence had no material connection with the crime charged in the indictments and appears to have been but another incident which occurred on June 19 which helped the witness fix the date on which other events occurred.

The defendant theorizes that by using this example the court may have led the jury to believe it could infer from the defendant's silence the truth of any fact of which there

had been proof, regardless of whether it was inculpatory or otherwise.

It is apparent, we think, that the trial judge's reference to the gift of the stool was purely an illustration utilized in an attempt to explain to the jury the law on the subject while staying on neutral ground and avoiding emphasizing any part of the State's evidence which directly implicated the defendant in the commission of the crime. Had the trial court referred to the blood-stained trousers or to the three $100 bills or other like incidents in the testimony, the defendant would surely be claiming such reference was prejudicial in the extreme as placing undue emphasis on incriminatory testimony.

A realistic appraisal of the charge as given convinces us it could not and did not prejudice the defendant.

The defendant also urges as error the refusal of the trial court to grant some 18 of his requests to charge and a portion of a nineteenth. However, examination reveals that the substance of each and every one of the omitted requests was in fact charged by the court in its own language, which we find was entirely adequate. As we have often noted, the trial judge is not required to charge in the precise language requested, where the subject matter is correctly and fully covered in the charge. *State v. Tansimore*, 3 *N. J.* 516, 526 (1950); *State v. Roscus*, 16 *N. J.* 415, 426 (1954); *State v. Tune*, 17 *N. J.* 100, 116 (1954); *State v. Rios*, 17 *N. J.* 572, 607 (1955). The charge as a whole was a fair and complete resumé of the law as applicable to the case on trial, with full recognition of and protection to the rights of the defendant.

Finding no prejudicial error in the proceedings below, the judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.